<hr />

BARNES v. POIRIER et al.

(Circuit Court of Appeals, Eighth Circuit. October 22, 1894.)

No. 462.

PUBLIC LANDS—SOLDIERS" ADDITIONAL HOMESTEAD RIGHTS—ASSIGNABILITY.
  The right given by Rev. St. § 2306, to a soldier who had theretofore en-
tered, under the homestead laws, less than 160 acres, to enter enough more
to make up 160 acres, is assignable before entry, there being no restric-
tions as in the homestead act. 57 Fed. 956, affirmed.

Appeal from the Circuit Court of the United States for the Dis-
trict of Minnesota.

Suit by Camille Poirier and others, executors of John J. Costello,
against Francis A. Barnes, to quiet title. Decree for plaintiffs.
57 Fed. 956. Defendant appeals.

D. H. Twomey, for appellant.
Alfred Jacques (Theo. T. Hudson, on the brief), for appellees.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge. Is the right to land additional to a
homestead granted by section 2306 of the Revised Statutes assignable
before the additional land is entered? This is the only question

it is necessary to decide in this case. It arises in this way: February 10, 1888, Louisa Dryer, who was entitled to enter 120 acres of land under that section, made an irrevocable power of attorney to James A. Boggs to take possession of, sell, and convey any land she might acquire thereunder, and to retain for his own use the rents and profits of the land and the proceeds of its sale. January 5, 1888, she entered the land in question in this case under that section, and on the same day Boggs conveyed it under his power. The appellees derive their title from this conveyance. In 1890, Louisa Dryer died, and the claim of appellant rests upon deeds of this land which he obtained from her heirs after her decease. The land is vacant and unoccupied, and the appellees obtained a decree in the court below quieting the title to it in themselves. Pourier v. Barnes, 57 Fed. 956. The appellant insists that this decree was wrong, because the power of attorney to Boggs was in effect an assignment of the right of Louisa Dryer to enter the land, and as such was "in contravention of the laws of the United States, against public policy, and void." If it be conceded that the power was in effect an assignment, what statute or public policy does it contravene? Restraints upon alienation are not favored by the law. The modern rule is that one may do what he will with his own, unless prohibited by a positive statute, or restrained by a manifest public policy. It goes without saying that the assignment of this right before entry must be sustained unless it is thus clearly prohibited. The right of entry carries with it the right of immediate sale and disposition, in the absence of such a prohibition. It is not contended that there is any statutory prohibition of such an assignment. The contention is that the right to this additional land under section 2306 is a part of the original homestead right granted by sections 2289–2291, 2304, 2305, Rev. St., and that, because the assignment of that right before the entry of the land was contrary to public policy and void, the assignment of the right of entry under section 2306 is so. A careful comparison of these sections utterly fails to sustain this proposition. Sections 2289–2291, 2304, 2305, under which original homesteads might be entered, required each beneficiary to make affidavit, when he filed his application to enter the land, that his application was made for his exclusive use and benefit, and that his entry was made for the purpose of actual settlement and cultivation, and not for the use or benefit of any other person. They also required that he should prove, before he entered the land, that he had actually resided upon and cultivated this homestead for at least one year after he made his application, and that when he finally entered it he should make affidavit that he had not alienated any part of it. Inasmuch as he could not enter this original homestead after he had assigned or conveyed his right to any part of it, or agreed to assign or convey that right, without committing perjury, the courts uniformly held that such an assignment or conveyance before entry was against public policy and void. Anderson v. Carkins, 135 U. S. 483, 10 Sup. Ct. 905. But section 2306, which grants the

right to land additional to the homestead, under which the land here in question was entered, requires no affidavit of nonalienation or of any other fact, no settlement, no occupation, no cultivation of the land which it grants, either before or after entry. If the requirements of settlement, occupation, and improvement before entry and of an affidavit of nonalienation at the time of the entry manifest a public policy to prevent the assignment of the right to the original homestead before entry, it is difficult to see why the absence of all of these requirements as to the entry of the land additional to the homestead does not as clearly indicate a public policy to permit the assignment of that right as soon as it is acquired. The fact that in the same act of congress residence, cultivation, improvement, and an affidavit of nonalienation, were made conditions precedent to the exercise of the right to the original homestead, and none of these conditions were attached to the absolute grant of the right to the land additional to the homestead (17 Stat. c. 85, §§ 1, 2, p. 49; Rev. St. §§ 2304–2306), leads with almost compelling force to the conclusion that the policy of the nation was to leave the sale and disposition of the latter right entirely unrestrained. A' glance at the history of the legislation that is now codified in the sections of the Revised Statutes to which we have referred makes this conclusion irresistible.

In 1862 congress passed an act the title of which well expressed its purpose, viz. "An act to secure homesteads to actual settlers on the public domain" (12 Stat. c. 75, p. 392; Rev. St. § 2289 et seq.). The purpose of that act was twofold,—to grant to every loyal citizen of suitable age, and to every one of such age who had declared his intention to become a citizen, a homestead from the public domain, and to secure the speedy and permanent settlement and cultivation of the vast tracts of rich but vacant lands then held by the government. To accomplish this purpose, congress granted by this act to each of the beneficiaries named in it the right to enter 160 acres of the government lands that were subject to pre-emption at $1.25 an acre, or 80 acres of those subject to pre-emption at $2.50 an acre, on these conditions: That when he filed his application to enter the land he should make an affidavit that the application was made for his exclusive use and benefit, and that his entry was made for the purpose of actual settlement and cultivation, and not, either directly or indirectly, for the benefit of any other person or persons whomsoever; that no certificate or patent should issue for this land until five years after the filing of this application; that before he finally entered the land he should prove by two credible witnesses that he had resided upon and cultivated it for the term of five years immediately succeeding the filing of the affidavit aforesaid; and that he should at the time of his final entry make affidavit that no part of it had been alienated. Ten years later, in 1872, congress passed "An act to enable honorably discharged soldiers and sailors their widows and orphan children to acquire homesteads on the public lands of the United States" (17 Stat. c. 85, p. 49; Rev. St. § 2304 et seq.). The first section of that act granted to each of its beneficiaries, "on compli-

ance with the provisions of" the homestead act of 1862, and the acts amendatory thereof, as modified by that act, 160 acres of the public lands "to be taken in compact form according to the legal subdivisions, including the alternate reserved sections of public lands along the line of any railroad or other public work," allowed each beneficiary six months after locating his homestead to commence his settlement and improvement, and provided that the time which he had served in the army or navy should be deducted from the time required by the act of 1862 to perfect his title, but declared that no patent should issue to any homestead settler who had not resided upon, improved, and cultivated his homestead for a period of at least one year. It is common knowledge that the alternate reserved sections of the public lands along the lines of the railroads and public works referred to in this act had been generally subject to pre-emption at $2.50 per acre, so that the soldiers and sailors who had exercised their homestead rights upon these lands under the act of 1862 prior to 1872 could not have acquired more than 80 acres of this valuable land thereunder. Without another grant to them, the result would have been that those who had not exercised this right could acquire 160 acres of this land under the first section of the act of 1872, while those who had already entered their homesteads upon these lands would have been limited to a grant of 80 acres. To give to the earlier homesteaders equal privileges with the later, and to grant, as far as possible, the like rights and privileges to all the soldiers and sailors, their widows and orphans, the second section of the act of 1872 provided as follows:

"Sec. 2. That any person entitled under the provisions of the foregoing section to enter a homestead, who may have heretofore entered under the homestead laws a quantity of land less than one hundred and sixty acres, shall be permitted to enter *under the provisions of this act, so much land as* when added to the quantity previously entered shall not exceed one hundred and sixty acres."

By the act of June 8, 1872 (17 Stat. c. 338, p. 333), this section was so amended that the clause in italics above was made to read, "under the provisions of this act so much land contiguous to the tract embraced in the first entry as." But it was found that this amendment, in many, if not in most, cases, nullified the grant, because the earlier homesteader could not then find any public land contiguous to his first entry; and by the act of March 3, 1873 (17 Stat. c. 274, p. 605), the homesteader was relieved from entering the additional land "under the provisions of this act," and from entering a tract "contiguous to the tract embraced in the first entry," and the section was so amended as to read in legal effect as it now appears in section 2306, Rev. St., viz.:

"That any person entitled under the provisions of section twenty-three hundred and four to enter a homestead, who may have heretofore entered under the homestead laws a quantity of land less than one hundred and sixty acres shall be permitted to enter so much land as, when added to the quantity previously entered, shall not exceed one hundred and sixty acres."

This brief review of the legislation which has resulted in the existing provisions of the homestead law clearly shows that the

purpose and policy which inspired the grants in sections 2289–2291, 2304, 2305 were the very opposite of those which inspired that in section 2306. The purpose of the former was to induce the permanent settlement of the donee upon, and the continued occupation and cultivation by him of, the land granted. Hence the requirements of settlement, cultivation, and occupation for a long period of time before entry, and of the affidavit of the homesteader at the time of final entry that he had not alienated any of the land, and hence the inevitable conclusion that any sale or contract of sale of the right to enter the land or of the land to be entered under these sections was an evasion of one of the main purposes of the act, and was against public policy and void. Anderson v. Carkins, supra. But the beneficiary of the grant under section 2306 had already selected, settled upon, cultivated, and acquired his homestead from the public domain, and was presumably in the occupation of it before that grant was made. The purpose of the grant under that section surely was not to induce him to abandon his homestead, and make a new settlement on the new grant. It was rather to reward him for the services he had already rendered as a soldier in suppressing the Rebellion, and as a farmer in establishing his home upon, cultivating, and occupying that portion of the public domain he had already entered as his homestead. Hence it was that no settlement, no cultivation, no occupation, no affidavit of nonalienation, no affidavit at all was made a condition precedent to the enjoyment of the benefits of this grant or to the entry of the additional land under this section. The beneficiary was left free to select this additional land from any portion of the vast public domain described in the act, and free to apply it to any beneficial use that he chose. It was an unfettered gift in the nature of compensation for past services. It vested a property right in the donee. The presumption is that congress intended to make this right as valuable as possible. Its real value was measured by the price that could be obtained by its sale. The prohibition of its sale or disposition would have made it nearly, if not quite, valueless to a beneficiary who had already established his home on the public domain. Any restriction upon its alienation must decrease its value. We are unable to find anything in the acts of congress or in the dictates of an enlightened public policy that requires the imposition of any such restraint. On the other hand, the general rule of law which discourages all restraints upon alienation, the marked contrast between the purpose and the provisions of the grant of the right to the original homestead, and the purposes and provisions of the grant of the right to the additional land, and the history of the legislation which is codified in the existing homestead law, leave us without doubt that the assignment before entry of the right to this additional land granted by section 2306 of the Revised Statutes contravenes no public policy of the nation, violates no statute, and is valid as against the assignor, his heirs and assigns. Moreover, if we were in doubt upon this question, we could not and ought not to shut our eyes to the fact that the conclusion which we have reached has been generally

accepted and acted upon as the law upon this subject for more than a decade in the western states, where most of these rights to lands additional to homesteads have been exercised. In 1882 the supreme court of the state of Wisconsin, in Knight v. Leary, 54 Wis. 459, 11 N. W. 600, held that a conveyance before patent, under a power similar to that in question in this case, of the land entered under section 2306 was sufficient to convey the title. In 1886, in Mullen v. Wine, 26 Fed. 206, Judge Brewer, then circuit judge of this circuit, now Mr. Justice Brewer of the supreme court, delivered a convincing opinion to the effect that this right to additional land was personal property, and assignable before entry. In 1887, in Rose v. Lumber Co., 73 Cal. 385, 15 Pac. 19, the supreme court of California held such a right assignable before the entry of the land. These decisions met the general approval of the gentlemen of the bar, and in reliance on them thousands of acres of land have been conveyed under powers of attorney similar to that before us, and under assignments of these rights made before the lands were en- tered. In these western states land may almost be said to be an article of merchandise. It is bought and sold far more fre- quently than in the older states, and many tracts of these lands have been conveyed many times, and valuable improvements have been made upon them by the purchasers whose titles rest upon such assignments and powers. These early decisions have been repeat- edly affirmed. Montgomery v. Land Bureau, 94 Cal. 284, 29 Pac. 640; Webster v. Luther, 50 Minn. 77, 54 N. W. 271; Montague v. McCarroll (Utah) 36 Pac. 50. This course of judicial decision ought not to be reversed, the titles to the lands conveyed on the faith of it ought not to be disturbed, and the inevitable litigation concern- ing them that must follow such a reversal ought not to be invited, unless the decisions to which we have referred were clearly erro- neous. In such a case it is sometimes more important that the law should be settled and certain than that it should be technically right. For this reason, if the question before us was doubtful, we should hesitate long before we reversed a course of decision so long accepted in these states, and upon the faith of which so many valuable rights rest. But it is unnecessary to continue this dis- cussion further, because we are satisfied, for the reasons stated in the earlier part of this opinion, that the early decisions to which we have adverted were undoubtedly right. The decree below must be affirmed, with costs, and it is so ordered.