MURRAY, RESPONDENT, *v.* WHITE ET AL., APPELLANTS.

(No. 2,930.)

(Submitted December 17, 1910. Decided January 16, 1910.)

[113 Pac. 754.]

*Specific Performance—Real Property—Public Lands—Mineral and Agricultural—Validity of Claims—Fraud—Compromise Agreements—Public Policy—Contracts—Construction.*

Placer Mining Claims—Location—Extent of Deposits—Sufficiency.

1. The failure of the locator of a placer mining claim to develop a paying property within a given time does not of itself stamp the location fraudulent; if mineral sufficient in quantity was found to justify the locator in spending time and money in the prosecution of development work, with a reasonable expectation of finding gold in paying quantities, his claim will be held valid as against the assertion that he made the location knowing it to have been nonmineral in character.

Specific Performance—Fraud—Burden of Proof.

2. One who claims that he was induced to enter into a contract through fraud, in that a certain fact was concealed from him, has the burden of proving that the fact alleged to have been concealed was a material one, and that but for the concealment he would not have become a party to the agreement.

Same—Public Lands—Rival Claims—Compromise Agreement—Consideration.

3. Where both plaintiff and defendant in a suit looking to the specific performance of a contract to convey lands had a claim to three forty-acre tracts, which he was asserting, the relinquishment by plaintiff of his claim to one of them in favor of defendant, for the purpose of

effecting a compromise and facilitating the issuance of patent was a sufficient consideration for the contract sued upon.

Same—Contracts—When Against Public Policy.
4. A contract will not be held void as against public policy unless it in itself requires the doing of something which adversely affects the public welfare, or is forbidden by law, or the consideration of which is illegal or immoral.

Same—Contracts—Fraud on Third Party.
5. A court of equity will not lend its aid to carrying the object of an illegal contract into effect; neither will it declare an agreement which is fair and just as between the parties and under a specific enforcement of which each party will receive what he agreed he should receive, void as against public policy because at the time of its execution one of the parties gave voice to the notion that by virtue of its terms he would be enabled to defraud a third party.

Same—Public Lands—Mineral and Agricultural—Validity of Claims.
6. Certain public lands may be valuable for both mineral and agricultural purposes; hence one person may assert a mineral application and another an agricultural one for the same parcel of land, without the conduct of either being open to the imputation of fraud.

Same—Mineral and Agricultural Lands—Rival Claimants—Compromise Agreement—Validity.
7. Where the same public lands were entered by one party under a mineral application and by another under an agricultural one, and such lands had little value for either purpose, and there was a *bona fide* contest before the land department as to the particular use for which they had the greater value, an amicable settlement of the controversy by a division of the land between the rival claimants may not be said to have been illegal.

Same—Public Lands—Entry Under Scrip—Contract to Convey—Public Policy.
8. A contract made by an entryman upon public lands under a soldier's additional homestead scrip, to convey title to a portion of the land upon issuance of patent, is not against public policy, is not prohibited by law and may be enforced.

Same—Public Lands—Conveyance—Fraud—Pleading and Proof.
9. One contending that a contract entered into between himself, as a qualified entryman upon public lands, and a person who was disqualified, by the terms of which the former was to secure patent to such lands and thereafter convey to the latter, should not be specifically enforced because fraudulent, must plead, and has the burden of proving, that the transferee was disqualified to take patent in his own name.

Same—Public Lands—Procuring Patent—Division of Expense—Contract—Construction.
10. Where it was agreed between two claimants to public land that patent should be secured in the name of one, the other to bear one-half the expense of procuring it, the parties being unable to arrive at or fix the exact amount thereof, the contract must be construed to mean one-half of the reasonable expense and not one-half of such expense as the patentee saw fit arbitrarily to incur.

*Appeal from District Court, Silver Bow County; J. J. Lynch, Judge.*

ACTION by James A. Murray against Robeson T. White and another to enforce the specific performance of a contract to

convey real property. Plaintiff had judgment, and defendants appeal from it and an order denying them a new trial. Affirmed.

*Messrs. Kirk, Bourquin & Kirk,* and *Mr. Wm. T. Pigott,* submitted a brief in behalf of Appellants. *Mr. Pigott* argued the cause orally.

By virtue of section 6103, Revised Codes, specific performance will not be enforced against a party if his assent to the contract was obtained by the other party's misrepresentations, concealments or unfair practices, nor where his assent was given under the influence of misapprehension. This is defendants' first defense. We contend that Murray knew, or, what is equivalent, had reason to know and ought to have known, that the lands were not valuable for placer deposits, were not mineral, and that his location as placer and application for placer patent were based on false and fraudulent representations. To prosecute a claim which the claimant knows to be false and unfounded, is fraudulent conduct. (*Kercheval* v. *Doty,* 31 Wis. 476.) The burden was on Murray to prove that White was not induced to make the agreement by Murray's conceded false representation. It having been a false and material representation, the presumption is that it was a contributing influence inducing White to enter into the contract. (*Gosh* v. *Land Co.,* 95 Va. 161, 27 S. E. 842; *Wilson* v. *Administrator,* 91 Va. 183, 50 Am. St. Rep. 824, 21 S. E. 245; *Hicks* v. *Stevens,* 121 Ill. 186, 11 N. E. 243; *Fishback* v. *Miller,* 15 Nev. 443.) It need not be the sole, nor even principal, inducement, but is sufficient if it materially influenced the mind of the deceived person and was one of many motives inducing his consent. (20 Cyc. 41; *Yates* v. *Bank,* 74 Neb. 734, 105 N. W. 292.) Specific performance rests in the sound discretion of the court, and before granted the contract must appear to be fair and the circumstances must be such as appeal to the conscience of the court and compel its discretion. (*Shoop* v. *Burnside,* 78 Kan. 871, 98 Pac. 202.) The contract must be free from suspicion of its *bona fides,* and

made under circumstances that favorably commend it to the court. (*Brewing Co.* v. *Brewery,* 107 Md. 696, 69 Atl. 514.)

Specific performance is refused where there is not adequate consideration for the party's promise, and as to him the contract is not just and reasonable. (Revised Codes, sec. 6103.) This is defendants' second defense. Murray did not in good faith believe his claim was valid. Settlement of or yielding up such a claim is no consideration for a promise (9 Cyc. 336, 342, 346; *McGlynn* v. *Scott,* 4 N. D. 18, 58 N. W. 461); if clearly groundless, it is no consideration. (*Taylor* v. *Weeks,* 129 Mich. 233, 88 N. W. 467.) So, too, where the claimant had good reason to believe it groundless. (*Fryer* v. *Cetnor,* 6 N. D. 518, 72 N. W. 909.) Murray knew White had a complete defense to the former's claim to the east forty in the former's abandonment thereof. This defense was unknown to White, and Murray concealed it. This was fraud, and can be shown here in defense against enforcement of the compromise agreement. (*Feeter* v. *Weber,* 78 N. Y. 337.) Forbearing to do what one cannot legally do, or forbearance to enforce an unenforceable claim, is no consideration for a promise. (*Bank* v. *Hoskins,* 33 Mont. 308, 83 Pac. 493; 9 Cyc. 336.) Giving up a fraudulent claim which in honesty and common fairness one should abandon is no consideration. (*Boston* v. *Dodge,* 1 Blackf. 19 (Ind.), 12 Am. Dec. 205; see, also, *Mayger* v. *Cruse,* 5 Mont. 494, 6 Pac. 333; *Traphagen* v. *Kirk,* 30 Mont. 568, 77 Pac. 58.)

Murray designed the agreement to injure and defraud the street railway company. For this reason equity denies him relief under the maxim, "He who comes into equity must come with clean hands." This is defendants' third defense. A contract between two, with intent to injure a third, is void as against public policy, and will not be enforced. (*Randall* v. *Howard,* 2 Black. 85, 17 L. Ed. 269; 16 Cyc. 145, 146.) And this is true even though ineffectual to ultimately accomplish its evil purpose. Where conveyances of property are made with intent to prevent its application to the satisfaction of possible claims against the grantor, which claims are false or which are de-

feated in litigation, the grantee will not be compelled to perform a promise to reconvey. (*Randall* v. *Howard*, 2 Black. 85, 17 L. Ed. 269; *Carson* v. *Beliles*, 121 Ky. 294, 89 S. W. 208, 1 L. R. A., n. s., 1007; *Pride* v. *Andrews*, 51 Ohio, 405, 38 N. E. 84; *Poppe* v. *Poppe*, 114 Mich. 649, 68 Am. St. Rep. 503, 72 N. W. 612. And see generally, *Briggs* v. *Coffin*, 91 Iowa, 329, 59 N. W. 262; *Ratliff* v. *Ratliff*, 102 Va. 880, 47 S. E. 1007; *Massi* v. *Lavine*, 139 Mich. 140, 102 N. W. 665; *Jones* v. *Jones*, 20 S. D. 632, 108 N. W. 25; *Freeman* v. *Sedwick*, 6 Gill, 28, 46 Am. Dec. 654; *Kihlken* v. *Kihlken*, 59 Ohio, 106, 51 N. E. 972; *Cochonour* v. *Ratcliff*, 223 Ill. 274, 79 N. E. 85; *Reynolds* v. *Boland*, 202 Pa. 642, 52 Atl. 20.) Even where one is himself defrauded by participating in a transaction wherein he is willing to and erroneously believes he is aiding to defraud another, equity will leave him in the toils of the web of iniquity he has woven and give him no aid or relief. (*Dakin* v. *Rumsey*, 104 Mich. 636, 62 N. W. 992; *Barnes* v. *Starr*, 64 Conn. 136, 28 Atl. 984; *Pride* v. *Andrew*, 51 Ohio, 405, 38 N. E. 84.)

The agreement tends to make possible illegal entries of public lands, and so is against public policy and void. This is defendants' fourth defense. (*Quirk* v. *Muller*, 14 Mont. 471, 43 Am. St. Rep. 647, 36 Pac. 1077, 25 L. R. A. 87; *Hughes* v. *Mullins*, 36 Mont. 276, 92 Pac. 758, 13 Ann. Cas. 209; 15 Ency. of Law, 2d ed., 934.) Specific performance will be denied if the contract is not free from doubt or suspicion of being opposed to public policy. (*Mayger* v. *Cruse*, *supra*.) A secret agreement by one to secure in his own name title to public land for the use and benefit of another and to then convey to that other, is against public policy, illegal and unenforceable. (*Keely* v. *Gregg*, 33 Mont. 224, 82 Pac. 27, 83 Pac. 222; *Kreamer* v. *Earl*, 91 Cal. 112, 27 Pac. 736.)

In behalf of Respondent, there was a brief by *Messrs. Roote & Murray*, and oral argument by *Mr. Murray*.

We submit that appellant has wholly failed to point out wherein the evidence is insufficient to support the findings and

decree in so far as the first defense is concerned, and we respectfully contend that the decision is amply sustained by the evidence, and that no other decision would have been justified.

Did appellant receive an adequate consideration? By the terms of section 2319, Federal Statutes, Annotated, the locator of a mining claim acquires a possessory title thereto and the right to exclusive possession and enjoyment thereof. His possession was a property right, the surrender of which would constitute a valid and adequate consideration. (*Belk* v. *Meagher*, 3 Mont. 78, 1 Morr. Min. Rep. 522; *Robertson* v. *Smith*, 1 Mont. 416, 7 Morr. Min. Rep. 196; *Gropper* v. *King*, 4 Mont. 367, 1 Pac. 755; *Lamb* v. *Davenport*, 18 Wall. 307, 21 L. Ed. 759; *Tarpey* v. *Madsen*, 178 U. S. 215, 20 Sup. Ct. 849, 44 L. Ed. 1042; *Waring* v. *Loomis*, 35 Wash. 85, 76 Pac. 510.)

The law does not prohibit the location of a mining claim on land classified as agricultural land. All public unoccupied land is open for exploration and purchase, and the location of a mining claim on land returned as agricultural land raises the presumption that the land is mineral in character. (*Washington* v. *McBride*, 18 L. D. 199; *Walker* v. *S. P. Ry. Co.*, 24 L. D. 172; *Sweeney* v. *N. P. Ry. Co.*, 20 L. D. 394; *Creede Co.* v. *Uinta Co.*, 196 U. S. 351, 25 Sup. Ct. 266, 49 L. Ed. 401.)

Murray's placer location was not shown to be invalid or insufficient for any reason, and in the absence of a showing that the land was more valuable for agricultural purposes, it was certainly a valid entry of the land, even though the present mineral showing was insignificant. The locator of a mineral claim is not required to show that his claim contains mineral in any particular quantities; the value or extent of the mineral deposits is a matter into which the government does not inquire for the purpose of determining whether or not a valid location has been made. A discovery of mineral authorizes the location, and any other rule would prevent exploration and development. (*Castle* v. *Womble*, 19 L. D. 456; *Tam* v. *Story*, 21 L. D. 440; *McShane* v. *Kenkle*, 18 Mont. 208, 56 Am. St. Rep. 578, 44 Pac. 979, 33 L. R. A. 851.) The burden was on defendants, attacking Murray's placer location, to prove that the land was, in

fact, more valuable for agricultural purposes. White himself admits that he considered it very doubtful as to his ability to win in the contest. As a matter of fact, it is apparent that he never could have succeeded. Inasmuch as White could not have succeeded in the contest, Murray was entitled to continue in the possession of the land under the federal laws, and continue his explorations and development, even if it be assumed that its present valuable character for mining had not been demonstrated, and the surrender of his rights, untainted with fraud, was a valid and adequate consideration. (*Tarpey* v. *Madsen, Lamb* v. *Davenport, supra; Bay* v. *Oklahoma Co.,* 13 Okl. 425, 73 Pac. 936.) It has even been held that a compromise of a doubtful right is a sufficient consideration for a promise. (*Duck* v. *Antle,* 5 Okl. 152, 47 Pac. 1056; 1 Page on Contracts, sec. 321.) The surrender of Murray's right to the land, though it was a doubtful right, or even though it subsequently developed that it was altogether invalid, is a good consideration. (*Tessendorf* v. *Lasater,* 10 Kan. App. 19, 61 Pac. 677; *Roy* v. *Harney Peak Co.,* 21 S. D. 140, 130 Am. St. Rep. 706, 110 N. W. 106.) The relinquishment of a right to a homestead entry on public lands and the withdrawal of a written protest against the final proof of another is a valid consideration. (*Hardesty* v. *Service,* 45 Kan. 614, 26 Pac. 29; *Waring* v. *Loomis,* 35 Wash. 85, 76 Pac. 510.)

Under the third defense interposed by defendants it is contended that the contract is contrary to public policy and void. The object of this contract at all times was, not to defraud the railway company, but to settle the controversy and obtain title from the government. It is claimed, however, that Murray entered into this contract with sinister motives, and with fraudulent intent, as against the railway company—a third party. This does not constitute any defense in an action on a contract between the original parties. No authority cited by appellant is in any manner applicable. All the cases cited by him are to the effect that "a contract between two, with intent to injure a third party, is void, as against public policy." We concede this to be the law. In the case at bar, it was not a contract with in-

tent to injure a third party. In all cases which we have been able to find on this question, applicable to the facts in this case, it is declared that even assuming that one of the parties to a contract did have any such sinister motive, the contract would not be void. (See *Calicott* v. *Allen,* 31 Ind. App. 561, 67 N. E. 197.)

The maxim that "He who comes into a court of equity must come with clean hands" applies only as between the parties to the contract, the plaintiff and defendant. The alleged design to defraud the railway company, in this case, was collateral to the agreement which had for its purpose the settlement of the conflicting claims and securing the title to the land. (9 Cyc. 556.)

Compromises such as the one here in question are favored. (*McCabe* v. *Caner,* 68 Mich. 182, 35 N. W. 901; *Tecumseh State Bank* v. *Maddox,* 4 Okl. 583, 46 Pac. 563; *Coleman* v. *Territory,* 5 Okl. 201, 47 Pac. 1079.)

The doctrine of public policy, is not allowed out of consideration for the defendant, but for the protection of the public. (*City of Concordia* v. *Hagaman,* 1 Kan. App. 35, 41 Pac. 133.) The defense of public policy is so often interposed as a last resort that courts have become suspicious of it, and the modern tendency is to restrict its operation in avoiding contracts. (1 Page on Contracts, sec. 326.) They should declare contracts void as against public policy only in cases free from doubt. (*Swann* v. *Swann,* 21 Fed. 299.)

No fraud upon, or injury to, the United States was contemplated by the parties; the contract is not contrary to any express provision of law; it is not contrary to any policy of express law, and is clearly not contrary to good morals. (*Picket Pub. Co.* v. *Board of Co. Commrs.,* 36 Mont. 194, 122 Am. St. Rep. 352, 92 Pac. 524, 13 L. R. A., n. s., 1115, 12 Ann. Cas. 986.)

MR. JUSTICE HOLLOWAY delivered the opinion of the court.

This suit was brought by Murray to enforce the specific performance of a contract to convey real estate. From a decree in

favor of plaintiff and from an order denying them a new trial, the defendants have appealed.

In his complaint the plaintiff alleges that in July, 1898, he and the defendant White each had an application before the land department of the United States, to enter the S. ½ S. E. ¼, and the S. E. ¼ S. W. ¼ of section 17, township 3 N. R. 7 W., in Silver Bow county; that the parties were claiming the land adversely, and, for the purpose of effecting a compromise and facilitating the issuance of patent, they entered into a contract by the terms of which Murray agreed to relinquish his claim to the S. E. ¼ S. W. ¼, hereinafter called the west forty, and the S. W. ¼ S. E. ¼, hereinafter called the middle forty, and not hinder or obstruct the issuance of patent therefor to White; and White agreed to relinquish his claim to the S. E. ¼ S. E. ¼, hereinafter called the east forty, and not thereafter hinder Murray in securing patent to that portion of the land; that White further agreed to procure the right to make, and make, a soldier's additional homestead entry, or other scrip entry, upon the west and middle forties, procure patent therefor, and, as, soon as patent should be issued, transfer the middle forty to Murray upon Murray's paying one-half the expense of such patent proceedings. It is then alleged that pursuant to the agreement the respective relinquishments were made; that White procured patent to the west and middle forties; that Murray paid a part of the expense and offered to pay the balance, if any, of the one-half of such expense, and has otherwise performed his part of the agreement, but that White refuses to render any account of the expense of procuring patent, and refuses to convey the middle forty as he agreed to do. It is alleged that defendant Lloyd claims some interest in the land in controversy, but that any claim which he may have was acquired subsequently to the date of the agreement between Murray and White, and with full knowledge of Murray's rights. A copy of the agreement is attached to, and made a part of, the complaint.

The answer of the defendant Lloyd alleges that his only claim to the land is subordinate to the claim of White, and depends for its validity upon a successful defense by White.

The answer of the defendant White does not deny any allegation of the complaint, but contains four separate affirmative defenses. The material allegations of these defenses were denied in a reply. Upon the trial the defendants assumed the burden of proof. The trial court found against them as to every one of their defenses, and the contention now is that the evidence preponderates against the findings made.

*First Defense:* It is alleged that the contract was procured by fraud, misrepresentation and unfair practices on the part of Murray, in this: that all the lands were agricultural lands of the United States; that White had a *bona fide* application before the United States land department to enter such lands under the homestead laws; that Murray claimed that all of the lands contained valuable deposits of placer gold and was claiming them under a pretended location thereof as a placer mining claim, whereas in truth and in fact said lands did not contain any deposits of placer gold, and were nonmineral in character, all of which facts were well known to Murray but unknown to White; that in fact Murray did not have any claim to the lands; had prior thereto relinquished his pretended claim to the east forty altogether and permitted others to locate the same; that for the purpose of deceiving White and inducing him to enter into the contract in question, Murray misrepresented the character of his pretended claim to the west and middle forties, and concealed from White the fact that he had no claim whatever to the east forty; that Murray represented that he had a good and valid placer location upon the lands and would contest and litigate with White for the lands; that relying on, and believing in, Murray's representations as to the character of his claim, and to avoid the threatened litigation, and not otherwise, White entered into the agreement.

(a) Appellants attack Murray's placer location as being fraudulent. They insist that the evidence shows that Murray

knew that the ground was nonmineral in character, and that his representation to White that he had a valid placer location was false and made with intent to deceive White and induce him to enter into the contract. It is true that the evidence as to the presence of minerals in the ground is very slight, and that Murray had maintained his location for several years without developing a paying placer and without demonstrating that the ground was in fact valuable for the minerals it contained. But there is some evidence that placer gold had been discovered in the ground, the surface of which is decomposed granite and other rock washed down from the near-by mountains. All the other portions of section 17 have been patented as placer locations. The ground is situated near the great quartz mines of Butte and along the same stream and not far from producing placers. The general character of the soil and the location of the ground are such as to indicate the presence of placer gold. Witnesses expressed the opinion that the ground could be mined profitably by dredging. Under these circumstances we do not think that it can be said that the evidence shows such a degree of poverty in the placer claim that Murray's assertion of that claim should be held to be fraudulent. Neither the federal nor state statutes require that, to constitute a placer, the ground shall yield any specific quantity of precious metals. Neither is it required that the deposits of mineral shall be sufficiently extensive to pay operating expenses in order to locate and maintain a valid placer claim.

It has long been the settled rule that to constitute a discovery, within the meaning of that term as used in mining law, it is sufficient that precious metals be found in the ground in quantity which justifies the locator in spending his time and money in prosecuting development work with the reasonable hope or expectation of finding mineral in paying quantities. (*Harrington* v. *Chambers,* 3 Utah, 94, 1 Pac. 362; *Book* v. *Justice Mining Co.,* 58 Fed. 106; *Nevada Sierra Oil Co.* v. *Home Oil Co.,* 98 Fed. 673, 27 Cyc. 556; Snyder on Mines, secs. 349, 360; *Shreve* v. *Copper Bell M. Co.,* 11 Mont. 309, 28 Pac. 315; *Mc-*

*Shane* v. *Kenkle,* 18 Mont. 208, 56 Am. St. Rep. 578, 44 Pac. 979, 33 L. R. A. 851; *Noyes* v. *Clifford,* 37 Mont. 138, 94 Pac. 842.) The precious metals are not evenly distributed throughout veins or placer ground. A claim may be barren in one part, poor in another, rich in another and withal very valuable as a whole; so that the failure of the locator to develop a paying property within any given time is not conclusive against the validity of his claim. It is a part of the history of this mining region that even in the case of a placer claim, much time and labor must be expended and considerable expense incurred in developing a paying claim, when bedrock is covered with great quantities of debris, as is the case in the present instance. The evidence shows that Murray is a man of experience in mining operations, and that he evidenced his faith in the validity of his claim by the expenditure of considerable money in sinking shafts in attempts to reach bedrock where he expected to find placer gold. Furthermore, White had an equal opportunity with Murray to examine the soil, determine its character, and decide for himself whether Murray's contention that the land was mineral in character had any foundation in fact. While there are facts and circumstances which tend to discredit Murray's claim, we are not satisfied that the evidence preponderates against the trial court's finding.

(b) It is further insisted that Murray perpetrated a fraud on White in concealing the fact that he had already relinquished his claim to the east forty. The defendants having the burden of proof, were compelled to show: (1) That the fact concealed was a material one, and (2) that but for the concealment White would not have entered into the agreement. White testified that some time in the early part of 1898, before the contract with Murray was entered into, he discovered that the east forty contained brick clay; that he called this fact to the attention of his attorney, and was advised that the land department might hold that forty subject to mineral entry, and because of this advice he did not attach so much value to his homestead application for that forty; that he was of the opinion that the land

department had classified the middle and west forties as agri-
cultural land; that he knew the east forty was clay placer, and
that he had little hope of success in contesting with Murray.
Furthermore, White testified that his negotiations with Murray
commenced in May or June, 1898; that Murray then asserted
his claim and that he could secure proof necessary to procure
patent as a placer; that at their first meeting, Murray suggested
the terms of the compromise and he agreed to them; that he
knew in a general way that the surrounding lands had been
taken up as mineral claims, and that he signed a relinquishment
to the east forty, in which he stated that it was mineral land.

It is somewhat singular that, while evidence was given by
defendants as to the value of the west and middle forties, there
was not any given as to the value of the east forty at the time
the agreement between White and Murray was entered into; and
we are unable to know what, if any, value White attached to
his homestead entry at that time, so far as it related to the east
forty, while the evidence given by plaintiff is, that the land was
practically valueless for agricultural purposes. At the time the
agreement was entered into, the only claim made by White to
any of the land was based upon his application to enter it under
the homestead laws, and his own cross-examination tends
strongly to cast suspicion upon the *bona fides* of that claim.

While the evidence is not very definite, we think it fairly in-
ferable that the terms of the contract were actually agreed upon
before Murray relinquished his claim to the east forty, even
though the terms had not been reduced to writing, and, if this
is so, it was wholly immaterial to White what disposition Mur-
ray made of his claim to that parcel of land, and inconceivable
that Murray's subsequent concealment of the fact that he had
relinquished his claim could prejudice White. Viewed in any
light, we think that the defendants failed to maintain the burden
cast upon them, of showing that Murray's concealment of the
fact of his relinquishment at the time the contract was executed
misled White to his prejudice, or, speaking more accurately, the

evidence does not preponderate against the trial court's finding upon this question.

*Second Defense:* This defense is based upon a want of or inadequate consideration. It is alleged that the agreement on the part of Murray to defray one-half the expenses of procuring patent to the middle and west forties was wholly fictitious; that Murray did not have any valid claim to any of the land, and was, therefore, not foregoing any advantage or surrendering any right in relinquishing his pretended claim to those two forties; that at the time the contract was made, the land was of the value of $200 per acre; that defendant White had the preference right to enter all three forties, by virtue of his successful contest with one McCrimmon, a former claimant.

It is unnecessary to revert again to the evidence touching the character of White's homestead or Murray's placer claim. Under a charitable view, we think it can be said that each had a claim which he was asserting, to the entire three forties, and this being so, Murray's relinquishment of his claim to the west forty was a valid and sufficient consideration for this contract. (*Tessendorf* v. *Lasater,* 10 Kan. App. 19, 61 Pac. 677; *Hardesty* v. *Service,* 45 Kan. 614, 26 Pac. 29; *Waring* v. *Loomis,* 35 Wash. 85, 76 Pac. 510; *McCabe* v. *Caner,* 68 Mich. 182, 35 N. W. 901.)

*The Third Defense* is that the consideration for the contract was illegal. It is alleged that some time prior to the execution of the contract, Murray had granted a right of way over the middle forty to a street railway company; that when Murray and White reached an agreement for a division of this land, White insisted that he should procure patent to the west forty independently of Murray and leave Murray to procure patent to the middle and east forties; that Murray refused to agree to this arrangement, but insisted that White secure patent to the middle forty for the use of Murray, to the end that Murray might coerce the street railway company into paying again for the right of way, and thereby cheat and defraud the railway company, and because of Murray's insistence upon this term, and not otherwise, White entered into the agreement as made.

The contract, a copy of which is attached to the complaint, does not contain anything suggestive of illegality; and White protests his innocence of any active participation in the fraud which he claims Murray desired to perpetrate. Under the allegations of the complaint, it is not just clear how Murray could carry into effect his design. White was not bound by the contract to aid Murray in any way. His obligation extended only to securing patent and transferring the middle forty to Murray.

There is not any principle of law better settled than that a party to an illegal contract cannot come into a court of equity and have the illegal object carried into effect; but this suit does not have any such purpose. The contract obligates White to deed the land to Murray personally. If the performance of the contract is enforced, White and Murray will each have received just what he agreed he should receive, and no fraud will have been perpetrated on anyone. Does it lie in the mouth of White to say, then, that, although the contract was fair and just as between him and Murray, still it ought not to be enforced because at the time of its execution Murray cherished the hope that he might be able to defraud the street railway company by virtue of the terms of the contract? We think not.

Counsel for appellants have not called our attention to any decided case similar in its facts to the case before us, and neither have we found any. As nearly an analogous case as we can find is made out by these facts: A, a resident of this state, loans money to B, who gives a mortgage upon land situated in this state as security for the loan, but at A's request the mortgage and note are made to run to C, who is a nonresident—and this is done for the purpose of defrauding the state out of the taxes upon the mortgage. A takes an assignment from C of the note and mortgage, but does not place the assignment on record until foreclosure is sought. Upon B's default, A commences foreclosure proceedings and B defends upon the ground that the contract was and is void as against public policy. Upon these facts the Nevada and Kansas courts have refused to fore-

close the mortgage. (*Drexler* v. *Tyrrell,* 15 Nev. 114; *Sheldon* v. *Pruessner,* 52 Kan. 579, 35 Pac. 201, 22 L. R. A. 709.) But the decided weight of authority is against the holding of these courts. (*Crowns* v. *Forest Land Co.,* 99 Wis. 103, 74 N. W. 546; *Nichols* v. *Weed Sewing Machine Co.,* 27 Hun, 200, s. c., 97 N. Y. 650; *Callicott* v. *Allen,* 31 Ind. App. 561, 67 N. E. 196; Jones on Mortgages, sec. 619, and note; *Stilwell* v. *Corwin,* 55 Ind. 433, 23 Am. Rep. 672.) We think the rule is quite well settled that courts will not hold a contract void as against public policy unless the contract itself requires that something be done which adversely affects the public welfare, or is forbidden by law or the consideration is illegal or immoral. (*Callicott* v. *Allen,* above.) In *Lawson* v. *Cobban,* 38 Mont. 138, 99 Pac. 128, this court said: "Courts are reluctant to declare a contract void as against public policy, and will refuse to do so if by any reasonable construction the contract can be upheld." This contract is not of itself illegal or immoral. The consideration for it was the compromise of the conflicting claims of Murray and White. We do not think that it can be said that it falls within the class of contracts the enforcement of which is denied on the ground of public policy.

*Fourth Defense:* (a) The fourth defense is based upon the proposition that, since Murray had a mineral application for all these forties, and White had an agricultural application for the same lands, there could not be a lawful compromise of their claims so that one could receive a part of the disputed ground under a mineral application, and the other the remaining portion under his agricultural application. In their brief, counsel for appellants say: "The two claims were antagonistic to each other; one of them was fraudulent and illegal, based on false testimony and was an attempt to defraud the government of the United States." This premise is clearly erroneous and the argument based upon it, of course, equally so. That one person in perfect good faith may assert a mineral application for a particular parcel of public land, and another person, equally in good faith, may assert his agricultural application for the same

ground, is beyond question.   The same land may be valuable for both mineral and agricultural purposes.  Its mineral value may be slight, and under such circumstances it is a question of fact whether it is mineral land within the meaning of the federal statute.   Under such circumstances the controversy is settled by the land department, by determining whether the land is more valuable for the one purpose or the other.   (*Washington* v. *McBride,* 18 L. D. 199; *Sweeney* v. *Northern Pacific R. R. Co.,* 20 L. D. 394; *Walker* v. *Southern Pacific R. R. Co.,* 24 L. D. 172.)

It is conceded that as between rival claimants for the same piece of public land, a compromise of their differences is recognized—even encouraged—by the government; but it is argued that in every instance wherein reference was made to this well-known rule, both claimants were asserting rights under the same general character of entry.   And it is insisted that a case cannot be found in which the government recognized the right of one claimant, who was asserting title under a mineral location, and his rival who was asserting title under an agricultural entry, to compromise their differences so that one could secure patent to a portion of the land under his mineral application, and the other the remaining portion under his agricultural entry; and this may be true, but the fact—if it is a fact—that such a case has not been determined, can scarcely be considered evidence that such a compromise would not be recognized by the federal authorities if a case presenting it did arise.   We do not see any difference in principle between a case of this kind and one involving a controversy between rival claimants under the same character of entry.   Of course, title to known mineral land cannot be secured under agricultural entry (section 2318, United States Revised Statutes), and any effort on the part of rival claimants to secure such a result would be defeated as an attempted fraud on the government; but where, as in the case before us, the land has little value for either purpose and there is a *bona fide* contest involved as to the particular use for which the land has the greater value, we do not see any objection which

the government could interpose against an amicable settlement of the difficulty, by a division of the land between the rival claimants. Certainly there was not anything done by these parties which precluded the government from making an investigation of the land to determine its character.

(b) Again appellants say: "A secret agreement by one to secure in his own name title to public land for the use and benefit of another, and to then convey to that other, is against public policy, illegal and unenforceable." Stated thus broadly, the premise is not true. It is only true when the contract deals with a character of entry with respect to which the statutes of the United States prohibit such a contract. (*Lamb* v. *Davenport,* 18 Wall. 307, 21 L. Ed. 759; *Barnes* v. *Poirier,* 64 Fed. 14, 12 C. C. A. 9; *Webster* v. *Luther,* 163 U. S. 331, 16 Sup. Ct. 963, 41 L. Ed. 179.)

Pursuant to the agreement under consideration, White made his entry and procured patent to the middle and west forties by virtue of a soldier's additional homestead scrip. A contract by the entryman under such scrip entry, to convey title to a portion of the land when patent issues, does not contravene any public policy, is not prohibited by law and will be enforced. (*Webster* v. *Luther,* above; *Barnes* v. *Poirier,* above; *Tecumseh State Bank* v. *Maddox,* 4 Okl. 583, 46 Pac. 563; *Waring* v. *Loomis,* above; *Hardesty* v. *Service,* above.) In *Keely* v. *Gregg,* 33 Mont. 216, 82 Pac. 27, 83 Pac. 222, this court expressed the opinion that a contract of the character of the one now before us is invalid. The question was not before the court and the opinion expressed was *dictum.* However, on rehearing, 33 Mont. 227, 83 Pac. 222, the court withdrew its remarks and left the question open.

(c) But it is insisted that the enforcement of a contract of this character makes possible the evasion of the federal statute, by permitting one, who is not himself a qualified entryman, to secure title to government land by the indirect method of having patent issue to one who is a qualified entryman but who secures the patent under contract to convey the land to the

former. Without deciding the question, we may agree with counsel that if it appeared that Murray was not qualified for any reason to secure patent to the middle forty as agricultural land, then this contract by which White agreed to secure it for him, is not enforceable; but there is not any presumption that a contract is fraudulent and void. Defendants having the burden, were required to allege and prove that Murray was not qualified to take patent to the middle forty as agricultural land, and having failed to make such allegation or proof, they failed to sustain this contention. The case of *Kreamer* v. *Earl*, 91 Cal. 112, 27 Pac. 735, cited by counsel for appellants, is not inconsistent with this theory, for there it appeared affirmatively that the contract involved provided for securing to one person a quantity of public land in excess of the amount allowed under the statute.

Finally, it is urged that the trial court erred in fixing the amount which Murray should pay to White as a condition to White's transferring the middle forty. The contract provides that Murray shall pay to White one-half of the expense incurred by White in securing patent to the west and middle forties. It appears that at the time the contract was entered into, the land was involved in a contest between the McCrimmon and White applications; that it was necessary for White to have the services of an attorney to aid him in procuring patent, and that he arranged with his attorney to perform the necessary services upon a contingent fee of one-third the value of the west forty. Appellants now contend that since the west forty was shown to have a value of $50,000 for townsite purposes, and one-third if this value inures to the benefit of the attorney, Murray should pay one-half of that fee, or $8,333.33. However conclusive the agreement between White and his attorney may be upon the parties to it, Murray, who was not a party, cannot be bound. From the very nature of the case it was impossible for Murray and White to anticipate the exact amount of expense which would be incurred in securing patent, but in the absence of a fixed amount, Murray's contract to pay one-half of the expense

must be held to mean one-half of the reasonable expense, and not one-half of such expense as White might arbitrarily incur. (1 Page on Contracts, secs. 27, 28.) This was the view entertained by the trial court, and upon this basis the court ordered Murray to pay to White $1,130.

We do not find that any reversible errors were committed. The judgment and order are affirmed.

*Affirmed.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE SMITH concur.

Rehearing denied February 25, 1911.

