ROBERT MORRISON ET AL., APPELLANTS, *v.* ORA E. BENNETT, RESPONDENT.

[Submitted February 25, 1898. Decided March 14, 1898.]

*Partnership—Illegal Contract—Accounting.*

1. An agreement made by three persons by which they were to buy a mare, each paying one-third of the cost, train her and divide profits and losses, constitutes a partnership, although one of the members was to receive a salary for the animal, and for driving her.
2. SAME—*Illegal Contract—Accounting.*—A court of equity will not entertain a suit for an accounting between partners, where it appears that the purpose of the partnership was to secretly and surreptitiously purchase a horse, and then to entice a third party to make a wager on a horse race. It seems that a subsequent collateral or independent contract, founded on a new consideration, not immoral or illegal, is not contaminated by the original illegal agreement.
3. Where an order is made referring a case to a referee to take an account, but the court subsequently itself takes the testimony on the account, no exception to findings are necessary, and an order refusing a new trial is an appealable order.

*Appeal from District Court, Fergus County.    Dudley Du Bose, Judge.*

ACTION by Robert Morrison and another against Ora E. Bennett for an accounting and dissolution of partnership.

Findings were made for plaintiffs, and defendant was granted a new trial.    Plaintiffs appeal.    Affirmed.

Statement of the case by the justice delivering the opinion.

The plaintiffs and appellants, Morrison and Davis, sued the defendant and respondent, Bennett, for an accounting and a dissolution of partnership.

It is alleged in the complaint that plaintiffs and defendant formed a co-partnership for the purpose of owning, caring for, and racing a certain race horse known as "Lady Wallace" on equal terms and shares, and that they entered upon and continued to transact the business of such co-partnership, and were at the time of the suit co-partners on equal terms in the said business; that on September 7, 1895, the defendant, Bennett, without plaintiffs' consent, applied to his own use from the receipts and profits of said business the sum of $1,000, and continues to withhold the same, to the detriment of the partnership, and the damages of plaintiffs.    It is also alleged that the defendant is indebted to the plaintiff Morrison for certain moneys advanced by him to the partnership.

The defendant denied the partnership, and alleged an ownership in common of the mare.

The case was tried before the court with a jury.    After the plaintiffs rested, the defendant moved for a nonsuit upon six grounds, the principal ones being that the claim upon which the suit was based is a gambling indebtedness, or wager upon the result of a horse race; and that, if there was any partnership, it was an illegal one, instituted or formed for illegal purposes and against public policy and good morals.    The court overruled this motion, and thereupon the defendant declined to put in any evidence.    The court then dismissed the jury, holding that the plaintiffs had a right to recover upon the issue of co-partnership, as alleged in the complaint, but that an accounting was necessary in relation to the various transactions had between the plaintiffs and the defendant.    This accounting was had before the court itself, and, after due consideration, findings were made in behalf of the plaintiffs.    Sub-

sequently the defendant moved for a new trial upon the grounds of insufficiency of the evidence to justify the findings, and of error in law in overruling defendant's motion for a nonsuit. The court granted this motion for a new trial, from which order the plaintiffs now appeal.

*Cort & Worden* and *J. C. Huntoon,* for Appellants.

*F. E. Strannahan* and *William M. Blackford,* for Appellee.

HUNT, J.—Plaintiff Morrison testified that he and Bennett desired to get a race horse out to Fergus county for the purpose of racing; that Bennett said that he would write to Davis, the other plaintiff, in Ohio, which he did. Davis wrote back to Bennett that he would come out for $50 a month and board, and that the three of them would buy the mare Lady Wallace, the expenses of caring for her and racing her were agreed to be divided equally, and the losses, if any, were to be borne equally. Davis came out, and plaintiff Morrison met him at Billings, and came up to Lewistown, Fergus county, with him. The mare was put into training, and finally a wager was made with a Mr. Kane for $1,000—$500 a side—against a horse named "Distance," owned by one Dan Crowley, of Lewistown. The mare won the race, but the defendant, Bennett, who received the money after the race was over, never gave any portion of it or accounted for it to the plaintiffs. The only receipts of the partnership was this sum of $1,000. On cross-examination the witness said that Bennett first approached him with reference to buying the mare, the main object being to race Crowley; that it was agreed that they were to get a race with Crowley if they could, or any other race, but they wanted to beat Crowley's horse, and wanted to get a horse that could do that. The witness also testified fully in relation to the agreement between himself, Davis and Bennett, saying that each one was to pay one-third of the expenses of caring for the mare, and that Davis was to get $50 a month and his board for his particular care and for

driving.    The wager with Kane was between Bennett,  Kane, Davis and plaintiff Morrison.    Kane represented Crowley and Bennett, and Morrison  represented  the three  owners of the mare.

There was considerable testimony as to the amount of money bet upon the mare, items of care, etc., which we do not deem material to be stated on this appeal.

W. H. Davis, one of the plaintiffs, said that he had brought the mare to Montana after corresponding with Bennett; that Bennett, Morrison and himself were to own one-third of the mare each,  but that for  his working her he was to get $50; that they only  started  her in the one race with Crowley, which  she  won,  but that Bennett ''grabbed  the  money down.''

The  plaintiffs then offered certain letters in evidence as bearing upon the question of the alleged partnership between the plaintiffs and the defendant.    The  defendant objected to these letters upon the ground that they were not material or competent under the pleadings, and did not establish any facts. The court overruled this objection, and the letters then became part of  the plaintiffs' case.    These letters became very important evidence, and, were it not for their verbosity, we should incorporate them in full.    We refrain, however, from doing this, and shall only make excerpts from them which tend to show what the real object and purpose of the plaintiffs and the defendant were in  bringing  the mare from Ohio to Montana.

Under date of January 31, 1895, Bennett wrote to Davis as follows:   ''* * * There is a man here that has got some scrub horses that he thinks is fast trotters and pacers.    He is a man that has got lots of money.    Him and his friends will bet their  money.    His pacers are range stock without any mark.    Can go along somewhere from  2:40 to 2:30.    He is stuck to back  the  horses,  as he is a man without any knowledge of horse racing.    He has been in the country for a long time.  Has done business in the early days with the half-breed Indians.    He is a saloon keeper.    *   *   *   I want a man to

come and bring two good horses with him, one pacer and one trotter that can go along, rather have them with low marks, and we will match this man with a .dead mortal cinch. We can win several thousand dollars, which is like finding it. The way I would want to bring the horses in the country would be to sneak them in the town, put hair brand on them * * * so they would appear as range stock. * * * Would want you to write to me, and tell me what you would bring if you would come. It is meat for some one. Let me hear from you, so on, and keep this a secret. I remain, as ever, your friend, O. E. Bennett, Lewistown, Fergus county, Montana. P. S. The main object is to make it appear that the horses are undeveloped. The object is to give him a sure thing in the way of thinking. * * * We would use one horse; rather have pacer. This is no funny work with me. It is a matter of business.''

We quote the following extract from another letter to Davis from Bennett, dated February 26th: ''* * * You did not say in your letter whether this mare is a trotter or pacer. * * * This man that I speak of in my other letter has got two pacers that he would back for good money to make him think he has got the best of it, which is very easy to do through me. Stranger could not come in here, and handle him. He has two trotters, stallions, and one filly. He is big snap for some one to match horse race. This is no josh. * * * I mean just what I say. We have got the biggest sucker here, I think, in the state, and has got plenty of money. You do not want to come unless you bring something along to put him to sleep, and his friends, which is very easy to do. Of course, we will have to keep him in the dark, and match him up and up. You know what you have to contend with in your country,—a world of competition. It is no object in me to misrepresent things to you or any one else. There is no glory in this except to make some money. I don't want to mislead you from your best interest, or take you from your business where you would not prove to your and my benefit.''

From another letter we quote the following: ''I expect you to lease this mare, and come with her to Montana.' * * * I will have a partner in putting up the money and to help us do this man, and during the season we are willing you shall share one-third of all the money we can get out of this man, and will pay you $30 per month and board or $50 per month and board and we will take the winnings and pay all of the expenses. I will meet you at the railroad, I rather you would be one of the interested parties in the proceeds of the winning of the mare, for I think you would be more benefited. We don't want you to come out here and not be satisfied and make some money. * * * We want you to answer as soon as you can and tell us what you will do, * * * but will say, in short, we will not stand on any small things in our deal with you. Expect you to share the harvest with us and the benefit of the opportunity. * * * Please don't send your envelopes with your advertisements on or your name on. Don't want these people to get on to anything that would throw us off if you should come. * * * ''

Under May 8th Bennett again wrote Davis acknowledging the receipt of a letter from Davis to him, and saying: ''I never gave Mr. Love any reason to say that we wanted to do any ring business with you or the mare. You know my reason for wanting to get the mare in here on the quiet is to do this man here on match race. I wrote to you, in the first place, what my object was, and willing to leave the matter with you that I never asked you to do anything dishonorable in this transaction. I am very sorry that I ever wrote to Mr. Love to do anything for me if he has got no more sense. I asked him to please not say anything about the matter. * * * I shall write a letter to Love to-day asking him kindly to not talk so much. * * * I wrote in my letter to my friends for Bishop to give bill of sale of the mare. You may say to my friends that it is not necessary to do it, as it would explain to Bishop where the mare is going. * * * Hope everything will be all right. Will be at the railroad to meet you. * * * This is the place for such a mare. They

quite 'horsy.' * * * Ship to Fort Custer, Montana, over the Northern Pacific Railroad. Yours, truly, O. E. Bennett. P. S. Reship from Fort Custer to Billings, the next station. You will not have to unload; might be we may be at Fort Custer and go down with you to Billings."

Again, under April 3, he wrote to "Friend Davis" as follows: " * * * In regard to Lady Wallace, she is all right to do this man. * * * You wrote in your letter that you would be honorable, upright and fair in your business with me. That is just what I want and expect of you, and whatever business I have to do with you expect to be honorable and upright, and do as near as I agree with you as possible for me to do. That is the only way for a person to transact business. * * * If you come out here, we expect to do this party up, which is no great trouble to do, and we can do well with her other places. * * * I don't think you had ought to tell the parties what you are going to do with this mare, as they will take the advantage of our opportunity which is our benefit. As to confine this match race with this man, I could not confine it to any defined amount, but are satisfied we can do well, or I would not be willing to go to the expense of paying the amount to get you and the mare out here."

Under date of April 22d, Bennett wrote that they would buy the mare, he and Morrison to pay two-thirds of the cost, and Davis to take the other one-third; Davis to pay one-third of the expenses she would be, and Bennett and Morrison the other two-thirds; they also to pay Davis $50 a month and board; Davis to have one-third of whatever they won with the mare. Defendant Bennett closed this letter by asking Davis to let him hear from him as soon as possible, and adding: "I feel satisfied that you will do the best you can. Glad to know there is a young man in Ohio that has got a little nerve to come to Montana."

Let us first look at the form of the ownership of the mare. We mention this because respondent suggests that it was not a partnership, but an ownership in common. Although it is

not of importance to determine this point, we nevertheless distinguish the interests of the parties as those of partners. The testimony of the plaintiffs and their witnesses, and the last letters that were written agreeing to the purchase and ownership of the mare, show a special agreement between the two plaintiffs and defendant, whereby they were to buy the mare, each one paying a third of her cost, train her under a like agreement, and divide profits and losses of their racing ventures. One of the plaintiffs was to be allowed a monthly salary for actual care and driving, but that does not alter their legal relations. The original capital of this partnership was represented by the mare, to purchase which it was agreed each should contribute a share. From time to time moneys were advanced for the concern, whether by one plaintiff or another or by defendant made no difference, for, on principle, it all became the subject of accounting in equity between the owners.

In *French* v. *Styring*, 2 C. B. (N. S.) 357, the facts were these: Plaintiff was a trainer of race horses. Defendant was a merchant. A race horse was jointly purchased by plaintiff and one Cohen. Cohen afterwards sold to one Mallinson, and Mallinson and plaintiff agreed that plaintiff should keep the horse for the purpose of training him, and should have entire control and management of him; that a fixed sum should be allowed as expenses of keeping the horse; that plaintiff should pay the expenses of entering the horse and conveying him to the races; that each should pay half of the horse's keep and other expenses, and that the winnings should be equally divided. Mallinson sold to the defendant, who agreed with plaintiff that he (plaintiff) should go on and manage the horse upon the same terms as agreed upon with Mallinson. In an action at law to recover of defendant the moiety of the keep and expenses of the horse since defendant became possessed of his moiety, it was argued that plaintiff and defendant were partners, and therefore plaintiff could not recover. The judges were not wholly agreed on the question of partnership. They thought that there was not a partnership in the horse,

but a joint ownership, yet that there was a tenancy in common, which entitled plaintiff to recover for money advanced to put the horse in condition to race.  Cockburn, C. J., was inclined to think there was no partnership in the horse, but, with other judges concurring, held that they were partners in the mode of working and managing it for their common benefit.  The doctrine of that case is approved of by Parsons on Partnership, § 76; and, while it is to be distinguished from the case at bar, it yet, by analogy, is an authority of great weight, for Cockburn, C. J., reasoned that, if the two had agreed that a certain sum should be contributed by them in equal moieties as the capital of the partnership, the moment money was so paid in as capital it became part of the partnership fund, resulting only in matter of account.  Here there was an equal payment of money by three persons under a specific agreement to buy a horse for a particular purpose, and to share equally in ownership, keep and all expenses connected with the racing project for which the partnership was formed. The agreement, therefore, went much further than in *French* v. *Styring*, and, it seems to us, made a partnership relation.

This being so, was it a partnership the real object of which was the attainment of that which is contrary to law, or, if the object was a legal one, was the attainment of such object sought in a way which is forbidden by law?  If either of these questions is answered affirmatively, the partnership was illegal, and the parties must abide the consequences.  (Lindley on Partnership, *page 180.)

We shall not decide that the racing of horses, conducted in a proper and fair manner, for purses offered by associations, is contrary to law.  It was not illegal at common law.  Nor is there a statute of the state against such a practice.  Nor do we believe that it is against public policy, where the purse is offered in good faith, and not as a subterfuge for betting and gaming.  Horse races are looked upon as a species of gambling largely because men bet on the results, thus wagering upon uncertain results; but that is a different matter.  There are many evils incidental to many strifes for premiums, yet all competitive contests are not unlawful.

Folger, J., in *Harris* v. *White*, 81 N. Y. 532, said: ' A purse, prize or premium is ordinarily some valuable thing, offered by a person for the doing of something by others, into the strife for which he does not enter. He has not a chance of gaining the thing offered, and, if he abide by his offer, that he must lose it, and give it over to some of those contending for it, is reasonably certain. Such is the meaning of the words now, in common understanding, in the practical use of them, and in the legislative purview,'' etc. Bearing in mind this definition of a purse or premium, it is difficult to see why it is really more immoral to honestly try the relative speed of horses in a fair contest for a prize than it is to test the relative value of dogs at a bench show, where prizes are offered to the winners, or the beauty of fowls at a poultry exhibit, or the merits of cattle at a state fair for money premiums. If such contests are honestly conducted, but little objection can be well urged against them, or any of them; while, if there is cheating, the rascality renders them objectionable and immoral.

But we shall inquire into the real purpose that Morrison and his partners had in this case. It appears that Bennett went to Morrison, and suggested the buying of a race horse, the ''main object'' being to beat Crowley's horse. To attain this object, they set on foot a scheme of deception, misrepresentation and cunning. Their plan, as exposed by the language of the letters, being to match Crowley ''with a dead mortal cinch,'' Bennett advised Davis to ''sneak'' the horse into Lewistown, and to put a hair brand on her, so as to have her appear as a range animal. The idea was to make Crowley, the selected victim, look upon the imported animal as ''undeveloped,'' that he might have a ''sure thing in the way of thinking.'' He was ''a sucker,'' ''to be put to sleep,'' ''kept in the dark,'' and to be ''handled'' by the writer, Bennett. As a further part of the deception, Davis was cautioned not to address envelopes which contained his advertisement as a horse man in Ohio, lest the scheme be detected. They expected to ''do this party (Crowley) up,'' although Bennett ex-

pressly wrote that between themselves they expected to be "honorable and upright." Morrison acknowledged the object of the partnership, and evidently saw the letters of Bennett to Davis, and, as agreed upon in them, went to Billings to meet Davis and the mare. They made the bet of $1,000 with Kane, who acted for Crowley, Bennett and Morrison acting for their partnership. The race was won by the mare, and thus the conspiracy to defraud Crowley appears to have successfully ended. No more races were sought. The partners evidently quarreled over the spoils, and that honor pledged between the three partners themselves seems to have been lost sight of in Bennett's greed in positively refusing to share the spoils which passed into his hands.

No court will lend its aid to assist the plaintiff in enforcing an accounting in such a case. The very statement of the evidence proves that the object of the parties was most iniquitous, and that the methods agreed upon, and doubtless fully executed, were all dishonest, immoral, deceitful and corrupt. Men who associate themselves for the purpose of cheating others cannot ask the courts to distribute their booty by adjudging the demands of one against the other, arising out of their quarrels over their plunder. As said by Justice Baldwin in *Bartle* v. *Coleman*, 4 Pet. 184: "Public morals, public justice and the well established principles of all judicial tribunals alike forbid the interposition of courts of justice to lend their aid to purposes like this." And upon this broad principle, "*ex turpi causa non oritur actio,*" the District Court properly refused to carry out the illegal contract.

But, insist the appellants, if the agreement of partnership was unlawful and immoral, "the purpose of such partnership must also be admitted to be accomplished and executed," and the proceeds should be divided as agreed upon by the partners. This argument proceeds upon the reasons advanced by some of the English courts, notably Lord Cottenham's opinion in *Sharp* v. *Taylor*, 2 Phil. Ch. 801, that one of the two partners cannot possess himself of the property of the firm, and be permitted to retain it, if he can prove that in obtaining it

some provision of the law has been violated. "Can one of two partners, in any import trade," said that distinguished judge, "defeat the other by showing that there was some irregularity in passing the goods through the custom house? The answer to this, as to the former case, will be that the transaction alleged to be illegal is completed and closed, and will not be in any manner affected by what the court is asked to do as between the parties."

In *Sykes* v. *Beadon*, 11 L. R. C. D. 170, Jessel, M. R., however, speaks of Lord Cottenham's reasoning as "inconclusive and unsatisfactory." He said in part as follows: "The notion that, because a transaction which is illegal is closed, that therefore a court of equity is to interfere in dividing the proceeds of the illegal transaction, is not only opposed to principle, but to authority,—to authority in the well known case of the highwaymen, where a robbery had been committed, and one highwayman unsuccessfully sued the other for a division of the proceeds of the robbery. So in the case he puts of one of two partners engaged in merchant trade. As I read it, he meant the trade of smuggling goods. If two persons go partners as smugglers, can one maintain a bill against the other to have an account of the smuggling transaction? I should say certainly not. It is not sufficient to say that the transaction is concluded as a reason for the interference of the court. If that were the reason, it would be lending the aid of the court to assert the rights of the parties in carrying out and completing an illegal contract. If the partnership is for the purpose of smuggling, that is an illegal contract, and the court cannot maintain it, and the court will not lend its aid at all to it. That reasoning, then, of Lord Cottenham's, is not sufficient; and I should have answered the question, not as Lord Cottenham does, in the affirmative, but in the negative. I do not say that this observation at all affects the authority of *Sharp* v. *Taylor* as it stands, but I think it does affect very much the dicta which I have read from the judgment; and that is the reason that I have read them. It is no part of the duty of a court of justice to aid

either in carrying out an illegal contract or in dividing the proceeds arising from an illegal contract between the parties to that illegal contract. In my opinion, no action can be maintained for the one purpose more than for the other.''

There is a rule discussed by Chief Justice Marshall in *Armstrong* v. *Toler*, 11 Wheat. 258, that a subsequent collateral or independent contract founded on a new consideration, not immoral or illegal, is not contaminated by the original illegal agreement. But that rule does not apply, as counsel would have it, here; nor is it in conflict with the principle that a court of equity will not sustain an action to enforce contributions between persons making profits realized from an illegal contract. This contract under investigation was illegal and immoral. The $1,000 was paid to one of the partners. And it is to carry out the partnership agreement to divide profits that this action is brought. ''There is nothing collateral in respect of which, the agreement being out of the question, a collateral demand arises.'' (*Snell* v. *Dwight*, 120 Mass. 9.) In this last case cited the court ably review the decision in *Brooks* v. *Martin*, 2 Wall. 70, cited to us by appellants herein, and properly, we think, treat it as an authority relating to subsequent or collateral contracts and transactions, in which the original illegal acts and contracts are held to form no part of the consideration.

The Supreme Court of North Carolina, in *King* v. *Winants*, 71 N. C. 472,—a somewhat similar case to the one at bar,— distinguish *Brooks* v. *Martin*, *supra*, as did *Snell* v. *Dwight*, *supra*, and, after so interpreting it, decided that they would not examine into, settle up and enforce, an illegal contract itself between the parties to it. See, also, *Chicago M. & St. P. R. Co.* v. *Wabash, St. L. & P. Ry. Co.*, 9 C. C. A. 659, 61 Fed. 993; Beach on Contracts, § 1522.

The New York Court of Appeals, in *Woodworth* v. *Bennett*, 43 N. Y. 273, restate the general rule as laid down by Mullett, J., in the earlier case of *Gray* v. *Hook*, 4 N. Y. 449, as follows: ''The general rule on this subject is laid down in this court in *Gray* v. *Hook*, 4 N. Y. 449, by Mullett, J., as fol-

lows: 'The distinction between a void and valid new contract in relation to the subject-matter of a former illegal one depends upon the fact whether the new contract seeks to carry out or enforce any of the unexecuted provisions of the former contract, or whether it is based upon a moral obligation growing out of the execution of an agreement which could not be enforced by law, and upon the performance of which the law will raise no implied promise. In the first class of cases, no change in the form of a contract will avoid the illegality of the first consideration, while express promises based upon the last class of considerations may be sustained.' "

It is unnecessary to go further. By the evidence here offered for plaintiffs they seek to enforce directly an immoral contract, and to secure the fruits of such a contract. It cannot be done. (Beach on Contracts, § 1431.) Plaintiffs are entitled to little sympathy. They knowingly entered into the contract, and are only suffering the consequences of a dishonest transaction in which they united, and which they proved in presenting their case. The fault of the parties being mutual, they can only rely for shares of profits upon those sentiments of honor which one of them wrote would exist when they entered into their immoral combination. Being in *pari delicto*, we apply the maxim *"Potior est conditio possidentis."*

Appellants raise a point of practice, contending that no appeal lies in this case from an order granting a new trial, because the case was tried by a referee, and defendant omitted to except to the findings of such referee. It appears by the record that the court, on the trial, did suggest the appointment of a referee to take the testimony in relation to the accounting. But it also appears that the suggestion never was acted upon, as the court itself took the accounting, made its findings of fact and conclusions of law thereon, and rendered judgment accordingly. An appeal did, therefore, lie.

The order granting a new trial is affirmed, and the lower court is directed to proceed in accordance with the views herein expressed.

PEMBERTON, C. J., and PIGOTT, J., concur.