DALLAS, APPELLANT, *v.* DOUGLAS, RESPONDENT.

(No. 3,081.)

(Submitted February 15, 1912. Decided March 1, 1912.)

[122 Pac. 275.]

*Contracts—Validity—Public Policy.*

Illegal Contracts—Public Policy.
   1.   Under the rules of the Department of the Interior, surveying contracts will not be given to a surveyor whose notes for a former survey have not been completed, and it is against the custom to grant successive contracts to the same surveyor, although the department has recognized the right of third persons to finance surveying contracts and to collect the remuneration. *Held,* that as the surveyors who did the work had to be examined and show their competency, a contract by which a second surveyor, who was ineligible because he had not handed in his notes on a previous survey, agreed to finance the contract for another survey, paying a salary to the surveyor who obtained the contract and did the work, and in return collecting the contract price from the government, was not illegal as against public policy, the government being in no way damaged.

Contracts—Validity—Public Policy.
    2. A contract will not be declared void as against public policy, if by any reasonable construction it can be upheld.

Same.
    3. A contract not requiring the doing of anything adverse to the public welfare or forbidden by law, and not based on an immoral consideration, is not invalid as against public policy.

*Appeal from District Court, Yellowstone County; Geo. W. Pierson, Judge.*

ACTION by William Dallas against George F. Douglas and others. From judgment for defendants, plaintiff appeals. Reversed and remanded.

*Messrs. Walsh & Nolan,* and *Messrs. Snell & Arnott,* submitted a brief in behalf of Appellant; *Mr. T. J. Walsh* argued the cause orally.

There is much said in this case about fraud and collusion and conspiracy. These are vocables which give rise to feelings of revulsion, but in a pleading they are meaningless. An averment that an act is fraudulent is not the statement of a fact. (*Butte Hardware Co.* v. *Knox,* 28 Mont. 119, 72 Pac. 301; *State* v. *Minn.-Mont. Land & Imp. Co.,* 20 Mont. 198, 50 Pac. 420.) The conclusions of a pleader stating as facts broad generalizations, sweeping and comprehensive assertions of conspiracy, fraud, mismanagement and incompetence, cannot be made in a pleading to supply the want of specific facts. (*Robinson* v. *Dolores No. 2 Land & Canal Co.,* 2 Colo. App. 17, 29 Pac. 753.) The supreme court of Oregon in the case of *Miller* v. *Hirschberg,* 27 Or. 522, 40 Pac. 510, said: "It may well be doubted whether the defendant could avail himself of the defense of illegality in this action; but however that may be, no such defense is set up in the answer, and therefore he is not entitled to the benefit of it as a matter of right. To entitle a defendant to the defense of illegality, he must plead it." (See, also, *Owens* v. *Davenport,* 39 Mont. 555, 104 Pac. 682.) An attempt was made to set up the illegality of the contract, but in glaring generalities only. The facts set forth do not constitute a defense, and as the insufficiency

of this defense can be raised for the first time on appeal, we submit that on the pleadings as they stand, so far as this defense goes, the appellant is entitled to judgment.

"Courts will not hold a contract void as against public policy unless the contract itself requires that something be done which adversely affects the public welfare or is forbidden by law, or the consideration is illegal or immoral." (*Murray* v. *White*, 42 Mont. 423, Ann. Cas. 1912A, 1297, 113 Pac. 754; *Lawson* v. *Cobban*, 38 Mont. 138, 99 Pac. 128.)

Assuming, for the sake of argument, that the contract in question was illegal, we still insist that the court erred in directing a verdict for respondent. (See *McDonald* v. *Lund*, 13 Wash. 412, 43 Pac. 349; *International Harvester Co.* v. *Smith*, 163 Mich. 55, Ann. Cas. 1912A, 1022, 30 L. R. A., n. s., 580, 127 N. W. 695; *California Cured Fruit Assn.* v. *Stelling*, 141 Cal. 713, 75 Pac. 322.) Illegality of executed contract no defense to an action by principal to recover proceeds from agent. (*Gilliam* v. *Brown*, 43 Miss. 641; see, also, *Floyd* v. *Patterson*, 72 Tex. 202, 13 Am. St. Rep. 787, 10 S. W. 527; *In re Dorr*, 186 Fed. 279.) In *Dunlop* v. *Mercer*, 156 Fed. 547, 86 C. C. A. 435, Judge Sanborn quoted with approval the following language of the supreme court of the United States: "The courts, while refusing to maintain any action upon the unlawful contract, have always tried to do justice between the parties, so far as could be done consistently with adherence to law, by permitting property or money, parted with on the faith of the unlawful contract, to be recovered back, or compensation to be made for it."

*Mr. R. J. Brennen*, and *Messrs. Nichols & Wilson*, submitted a brief in behalf of Respondent; *Mr. Wilson* argued the cause orally.

The rule requiring the alleged illegality to be pleaded as a defense does not apply where the illegality of the contract is disclosed by the plaintiff's own evidence. (9 Cyc. 742; *Handy* v. *St. Paul Pub. Co.*, 41 Minn. 188, 16 Am. St. Rep. 695, 4 L. R. A. 466, 42 N. W. 872; *School Dist.* v. *Sheidley*, 138 Mo. 672,

60 Am. St. Rep. 576, 37 L. R. A. 406, 40 S. W. 656; *Ah Doon* v. *Smith,* 25 Or. 89, 34 Pac. 1093; *Jefferson* v. *Burhans,* 85 Fed. 949, 29 C. C. A. 481; *Cardoze* v. *Swift,* 113 Mass. 250; *Baird* v. *Sheehan,* 38 App. Div. 7, 56 N. Y. Supp. 228; *Willis* v. *Weatherford Co.* (Tex. Civ. App.), 66 S. W. 472.) If the plaintiff sees fit, either by admissions of his attorney or by his own direct testimony, to bring to the notice of the court the accepted fact that the contract sued upon was an illegal one, of course he cannot be heard to complain that the question of the illegality of the contract was not raised by the pleadings, and that he has had no notice of such an issue in the cause, for he has seen fit to put the question in issue without notice. (*Maitland* v. *Zanga,* 14 Wash. 92, 44 Pac. 117.)

The rules and regulations of an executive department of the government are laws, and so far as the public welfare is concerned, when certain things are forbidden, the doing of those things is against public policy. (*Harvey* v. *United States,* 3 Ct. of Cl. 38.)

The following authorities support respondent's contention that the plaintiff cannot maintain this action, based as it is, upon the original illegal contract; and that contract being eliminated, there are no circumstances or facts upon which a collateral or independent agreement can be said to have arisen. Here you cannot proceed but through the illegal contract, and the authorities all agree that the courts will not enforce the provisions of such an agreement. (See *Goodrich* v. *Tenney,* 144 Ill. 422, 36 Am. St. Rep. 459, 19 L. R. A. 371, 33 N. E. 45; *Alexander* v. *Barker,* 64 Kan. 396, 67 Pac. 829; *Hinnen* v. *Newman,* 35 Kan. 709, 12 Pac. 144; *Hoffman* v. *McMullen,* 83 Fed. 372, 45 L. R. A. 4101, 28 C. C. A. 178.)

While we insist that this is not a case where the contract is executed, we are aware that there is a line of authorities holding that the proceeds arising from an illegal contract may be recovered where the contract has been fully performed. The appellant, however, will not be permitted to split or separate the agreement made by him with Douglas, and recover upon one por-

tion thereof as an executed contract, simply because it appears that the survey has been completed and the government has disbursed funds in payment therefor.   (See *McGregor* v. *Donelly,* 67 Cal. 149, 7 Pac. 422.)

In all the cases cited by appellant, the plaintiff was permitted to recover, not simply because the contract was executed, but because of some agreement, express or implied, arising after the completion of the original contract, or upon a collateral agreement in no way connected with the alleged illegality.

MR. JUSTICE SMITH delivered the opinion of the court.

The defendant Merchants' National Bank of Billings has on deposit the sum of $1,500, which is the balance remaining of a draft for $9,900 paid by the government of the United States for services performed by the defendant Douglas and one Parkinson under a surveying contract entered into and completed in the year 1907.   The deposit is evidenced by a certificate thereof payable to R. E. Shephard & Co. and George F. Douglas.   Shephard & Co. make no claim to any part of the money so deposited. This is an action in equity wherein the plaintiff seeks to have the said sum of $1,500 adjudged to belong to him, "that Shephard & Co. and Douglas be required to make the necessary indorsements on the certificate and surrender the same to him, and, in the event that this is not done, that the same be adjudged null and of no effect as against the plaintiff, and that the defendant Merchants' National Bank of Billings turn over to the plaintiff the said sum of $1,500 upon surrender of said certificate, or, in the event of its being adjudged of no effect as against the plaintiff, that it pay to plaintiff the sum of $1,500; that it be adjudged that the defendant Douglas has no right or interest in or to said money or said certificate," and that plaintiff have general equitable relief.   The complaint alleges, *inter alia,* that Douglas was in the employ of plaintiff in carrying out the surveying contract. The only portion of the answer of the defendant Douglas which is material here is an allegation to the effect that the plaintiff does not come into court with "clean hands" because his alleged

claim is founded upon a violation of law, and the relief he prays cannot in equity and good conscience be allowed. The cause was tried to the district court of Yellowstone county sitting with a jury. At the close of plaintiff's case, the defendant Douglas moved for a directed verdict in his favor upon the ground, among others, "that the contract is illegal in its nature and terms and in contravention of public policy." The motion was granted, and the jury returned a verdict accordingly. From a judgment on the verdict, dismissing his complaint and adjudging that he take nothing, plaintiff has appealed.

Plaintiff testified: "I had a talk with Douglas in January, 1907. In reference to this particular contract, I told him that [1] there were some contracts in the [surveyor general's] office, but I would not be eligible, but, if he would put in an application for one of them, I would recommend him for the appointment of deputy United States surveyor. In order to get one of these contracts, the applicant has to be a deputy mineral surveyor, and has to pass an examination. I likewise had a conversation with Parkinson. I did not make the application myself because I already had one, and had not filed my field-notes. There are some regulations with reference to that. Before the contract was awarded to them, I had a talk with Douglas in reference to the cost that would be incurred in carrying it out. In the case of this particular contract, the expenses that would be incurred in carrying it out would approximate $3,500. I told Douglas and Parkinson that I would finance the contract and pay the salaries—that is to say, that I would carry the contract through. I was to pay Parkinson $125 per month and five per cent of the profits, and Douglas was to receive $65 per month as chainman for Parkinson. After he worked for about a month and five days I went out to the camp, and put him to work writing notes after the field work was finished, and with this additional work he was to get $100 a month, and he gave me a power of attorney to collect the money. Pursuant to this arrangement, I borrowed $3,500 from Mr. Yegen, and, when I used that up, I got the balance from Mr. Shephard. At the termination of these

contracts there was paid by the government on this contract approximately $9,900. I had another contract with Mr. Helm, as I had with Mr. Douglas and Parkinson, and this money borrowed was spent on both contracts. I got $9,100 from Mr. Shephard on these two contracts. I broke about even on the Parkinson and Douglas contract. Work on this contract commenced about May 6, 1907, and was completed November 3, 1907. I was financing both contracts, and had the same arrangement as to the Helm contract that I did with Douglas and Parkinson. I was financing the contracts and paying the wages. Douglas did not complete the contract. He quit the 17th of July. I paid him all that was due him. The money on this contract was paid by the government September 9, 1909, and the warrant was sent to Shephard and it was cashed, and the present controversy is over the balance after paying Shephard. The warrant at the time of its issuance was payable to Parkinson and Douglas. It was turned over to the bank to pay the money that I borrowed to execute the work, so that after paying the indebtedness to the bank there was $1,500 left. I found out the power of attorney which Douglas gave me was not good. I had general supervision and direction of all the work that was performed under this contract. I made arrangements to borrow the money to finance it. I paid all of the expenses to all intents and purposes, regardless of the contract. It was my contract, and it was so understood at all times between me and Douglas. I did not execute the contract myself in my own name because I had one contract the year before and had not filed the field-notes yet, and there is a rule of the department that a surveyor will not have over one contract a year, or at least until he files his field-notes. That is a ruling of the General Land Office and I was familiar with it; in other words, I knew, if I applied to the government myself for this contract, it would be denied me, and that I could not get the contract. Q. And you therefore sought to and did evade the federal requirements and regulations of the department by having Parkinson and Douglas take the contract in their names and for your benefit? A. It was customary to do that. Those were

the facts. I.was careful to see that the department of the surveyor general and other federal authorities had no knowledge of the true facts surrounding the execution of this contract, and knew that, if the proper situation were discovered, the contract would be vacated. Douglas was merely acting as my agent in executing and performing the contract. My agreement with him was that I would recommend him for deputy United States surveyor, and, if he got the contract, I would finance it. I knew that upon the completion of the contract the money would be paid to the persons whose names appeared as contractors, and he gave me a power of attorney to collect the money. Douglas was required to execute a bond for the faithful performance of the contract, and this bond was furnished by him. I did not assume any ostensible responsibility at all, and was not known in the premises. I lost $700 on both contracts. The $1,500 does not represent the profits on this contract. I used other moneys than that received under this contract to take up this indebtedness incurred in financing this contract. It was customary to enter into contracts of this character in the manner in which this contract was entered into, and that fact was known to the department of the land office."

Mr. Parkinson testified: "Speaking about the examination, you have to satisfy the surveyor general that you are competent to do the work, and myself and Douglas did that. Before we made the application and before we entered into this contract, Dallas did not have anything to do with the contract. Dallas furnished the money to defray the expenses and carry out the contract. Myself and Douglas did not have anything to do with that; at least I did not, and Douglas did not to my knowledge. As a matter of fact Douglas did not do any work at all on this contract. He was working on the Helm contract. We signed a power of attorney, giving Dallas the power to collect this money, and afterward we signed another giving Shephard the power to collect the money, and the warrant was ordered sent to Shephard."

Mr. Shephard: "We put up the money to carry on this survey-ing contract to Mr. Dallas. We held Mr. Dallas for all money that we advanced. We held him for $9,448.44. I had a conver-sation with Mr. Yegen. They figured out that $6,000 would finance these two contracts. When they got through, they were pretty short of that amount. There was $3,000 or $4,000 more needed, and it finally came to me to put that money up. I went down to see the surveyor general at Washington, and told him the fix I was in, and he sent me the money, and, after I got the warrant, I applied the money to pay off these debts. The war-rant I obtained from the government was payable to Parkinson and Douglas. Parkinson and Douglas and Helm gave me each a power of attorney to settle with the government. They all re-quested me to turn the money over to Dallas and let him settle this thing up."

This case is not difficult of solution on the facts alone. In the first place, the testimony of plaintiff shows that the $1,500 in-volved is not the profit on the Douglas and Parkinson contract. He also testified that Shephard was repaid out of the proceeds of work performed by him six years before. But, aside from this consideration, there is not anything in the record to show that the contract between Dallas and Parkinson and Douglas was illegal, or involved any fraud upon the government, or any moral turpitude, or any misrepresentation or unfair dealing of any kind. It is true plaintiff declared Douglas to be his agent, and that he supervised and overlooked the work performed under the contract; but he was in a situation to do this on account of the fact that he was himself a surveyor. Shephard and Yegen would have had the same privilege of protecting the moneys ad-vanced by them, had they been competent to exercise it. Plain-tiff also testified that the contract would have been denied him, that he knew he could not get it. But for what reason? Simply because it was a rule of the department, as he understood, that a surveyor could not get more than one contract in any one year, or until he had filed his field-notes. We must presume that this contract was valid until the contrary appears. We are therefore

at liberty to look for a reason for the government regulation which is entirely compatible with the conclusion that the plaintiff might make a valid contract such as was made with Parkinson and Douglas. The reason for the regulation undoubtedly is to insure full performance by the contracting surveyor of the prior contract, to the end that he shall not be so overburdened with work that the interests of the government may suffer. Parkinson and Douglas were competent to contract. They had passed the required examination, and had given security for the faithful performance of the work. The government of the United States could suffer no injury, therefore, from any failure to perform or delay in performance on their part. It was fully protected. There is ample testimony in the record to show that, while Dallas probably could not obtain a second contract in his own name, the government authorized the practice of taking contracts in the names of others who were competent and reliable deputy mineral surveyors. There is also abundant evidence that the federal government recognizes the fact that surveying contracts must be financed by someone who is in a situation to do so. When Mr. Shephard informed the department at Washington that he had furnished the money to finance these contracts, it very promptly recognized his claim, and sent him the warrant for the balance due. In what different situation were Shephard and Yegen from that of the plaintiff, save that he was a government surveyor and they were not such? None whatever. Had plaintiff not occupied the position of a deputy mineral surveyor, could it be claimed for a moment that he might not finance the Douglas and Parkinson contract exactly as he did? He assisted them, as he had a right to do, and Mr. Shephard assisted him. He testified: "It was my contract." But was it? Assuredly not. It was the contract of Parkinson and Douglas. He also testified that, if the real situation were known, the contract would be vacated. But this was a mere conclusion on his part. Parkinson and Douglas having been duly appointed, after examination, as deputy mineral surveyors, and having given an indemnity bond, it is difficult to see how the government was concerned in

the question of who furnished their financial backing. There is not anything in the record, either in the shape of citation to a statute, or rule or regulation of the general or local land offices, or of the Interior Department, to indicate that this contract, in the manner of its execution or financing, was prohibited or even discouraged; and our attention has not been directed to any at the argument or in the briefs of counsel. In the absence of such statute, rule, or regulation, we presume that the contract was not illegal or against public policy.

Although it may be true that a defense such as is interposed by Douglas can be made by a party *in pari delicto,* when directly sued, yet it is difficult to see how, in equity and good conscience, he can assert a claim to this money. He did not remain to fully carry out his contract, and, according to the testimony of Parkinson, no part of the disputed amount was earned by him. He gave Dallas a power of attorney to collect the amount due from the government, received his wages in full as stipulated, and now, after discovering that his power of attorney was ineffective, claims all of the balance in the hands of the bank, notwithstanding the fact that, if he has any claim thereon whatsoever, Parkinson has one of equal merit. But Parkinson asserts no claim. One can easily find a reason why the government of the United States should readily assent to such arrangements as were made between Dallas and Parkinson and Douglas, and also between Dallas and Shephard & Co. The work of surveying the public lands is an important branch of the service and must go forward. It is altogether reasonable, therefore, to assume that the officers in charge of the Land Department recognize the fact that money is necessary and must be available to prosecute the work. If Parkinson and Douglas were mere "dummies," as the popular expression is, and took no part in carrying out the contract, an altogether different question might arise; but even so, after the contract price was fully earned, it is difficult to imagine any valid reason why it should not be paid over to the person entitled thereto, in the absence of fraud upon the government. The officers at Washington evidently recognize this fact, or, at least,

they are not concerned with the question of the final distribution of the contract price, as is amply evidenced by the facts in this case.

Many cases are cited by counsel for the respondent in support of their contention that this contract was illegal and against public policy. The principal case is, perhaps, *McGregor* v. *Donelly,* 67 Cal. 149, 7 Pac. 422, where the parties entered into a contract whereby one was to make application for the purchase of swamp land under the California Act of 1863 (Stats. 1863, p. 591) for the use and benefit of the other. The action was in equity to compel the delivery to plaintiff by defendant of the certificate of purchase. The court said: "We are of opinion that the intent of the Act of 1863 was plainly that the application and purchase was to be for the benefit of the applicant himself—a policy adopted to prevent the acquisition of large tracts of land by one person through the use of other persons. If such evasion of the statute as is attempted in this case should be allowed, it would be a very easy matter for one who had [already] acquired 640 acres of land, and therefore could not take the oath prescribed, by the employment of others who could take the oath, to acquire for himself, in manifest disregard of the intent and policy of the Act, many times 640 acres."

In the case of *Morrison* v. *Bennett,* 20 Mont. 560, 40 L. R. A. 158, 52 Pac. 553, cited by respondent, this court determined that the whole transaction involved a fraudulent conspiracy to gain money upon a horserace by "a scheme of deception, misrepresentation and cunning." Mr. Justice Hunt in writing the opinion of the court said: "No court will lend its aid to enforcing an accounting in such a case. The very statement of the evidence proves that the object of the parties was most iniquitous, and that the methods agreed upon, and doubtless fully executed, were all dishonest, immoral, deceitful, and corrupt. Men who associate themselves for the purpose of cheating others cannot ask the courts to distribute their booty by adjudging the demands of one against the other arising out of their quarrels over their plunder."

All of the cases called to our attention by counsel for the respondent clearly involved contracts and transactions which were either illegal or immoral, or manifestly against public policy. As has heretofore been demonstrated, we think the contract at bar was not tainted with any one of those qualities.

Courts are reluctant to declare a contract void as against [2] public policy, and will refuse to do so if by any reasonable construction it can be upheld. (*Lawson* v. *Cobban*, 38 Mont. 138, 99 Pac. 128.) A contract will not be held void as against public policy unless it in itself requires the doing of something which [3] adversely affects the public welfare, or is forbidden by law, or the consideration of which is illegal or immoral. (*Murray* v. *White*, 42 Mont. 423, Ann. Cas. 1912A, 1297, 113 Pac. 754.) We do not deem a further citation of authorities necessary. Respondent is defeated on the facts.

The judgment is reversed; and on the authority of *Stevens* v. *Trafton*, 36 Mont. 520, 93 Pac. 810, the cause is remanded to the district court of Yellowstone county with directions to enter a judgment or decree in favor of the plaintiff, in accordance with the prayer of his complaint.

*Remanded, with directions.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.