## SIMPSON, Respondent, v. SILVER BOW COUNTY, Appellant.

(No. 6,562.)

(Submitted January 25, 1930. Decided March 1, 1930.)

[285 Pac. 195.]

*Mr. H. J. Freebourn,* County Attorney, and *Mr. J. Frank Sullivan,* Special Assistant, for Appellant, submitted a brief; *Mr. Sullivan* argued the cause orally.

*Mr. Timothy* and *Mr. Harlow Pease,* for Respondent, submitted a brief; *Mr. Pease* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

Appeal by Silver Bow County from a judgment against it and in favor of John H. Simpson, plaintiff, on the judgment-roll alone. Conceding the presumption that the judgment is supported by evidence establishing all of the allegations of the complaint, defendant contends that those allegations are insufficient to constitute a cause of action.

The allegations of the complaint are to the following effect: In June, 1921, the plaintiff and defendant, acting through its board of county commissioners, entered into a contract whereby plaintiff agreed to furnish the commissioners, while sitting as the county board of equalization, information which would enable the board to cause to be "assessed and taxed according to law" a large amount of taxable property which had escaped taxation, the contract to apply only to property "added to the assessment of 1921." The agreed compensation is twenty per cent of the taxes actually collected and paid into the treasury. In case of protest, payment was to be made within thirty days after the litigation or controversy was determined in favor of the county; Simpson to pay all fees for special counsel and court costs accruing.

Pursuant to agreement, plaintiff furnished the commissioners, while sitting as a board of equalization, on July 20,

1921, with information to the effect that in 1920 the Butte & Superior Mining Company in making its return of net proceeds of the Black Rock mine made an illegal deduction of $2,719,379.93, thereby causing it to appear that the mine was operated at a loss of more than $1,500,000, thus escaping taxation on net proceeds for the year 1920. As a result of the information furnished such proceedings were had before the county board of equalization, the state board of equalization, and in the courts that there was placed on the assessment-roll of Silver Bow County for taxation against the mining company net proceeds of the mine amounting to more than $1,000,000, which had escaped taxation for the year 1920, and which assessment, after extended litigation, resulted in the payment into the treasury of taxes amounting to $45,346.35; the twenty per cent thereof being $9,069.27.

The complaint then alleges full performance of the contract by plaintiff and the presentation, and rejection, of a claim in due form for the amount claimed, with prayer for judgment in the sum of $9,069.27, with interest at eight per cent from October 23, 1925, the date of the rejection of the claim.

Defendant demurred to the complaint, and, on the overruling thereof, answered, alleging facts on which the contentions herein made are based. The cause was tried to the court, a jury being expressly waived. Judgment for the full amount claimed, with interest, was duly rendered, and from this judgment defendant has appealed. The contentions made, taken in their logical order, are:

1. The complaint is insufficient in that it fails to allege that the net proceeds mentioned were ''added to the assessment of 1921,'' as provided in the contract as a condition precedent to plaintiff's right to remuneration.

This contention is but briefly argued, and we consider it without merit. Time was not made the essence of the contract. (Sec. 7549, Rev. Codes 1921.) It is clear that, although the property was not added to the 1921 assessment, it was property omitted in 1920 and subject to assessment in 1921, and would have been added to the assessment-roll of 1921 had it not

been for the resistance to such action by the owners and the "law's delay," for which neither Simpson nor the county board of equalization was responsible. Ultimately the attempt to add this property to the assessment of 1921 resulted in payment into the treasury of more than $45,000, and this benefit the county received by reason of the information given it by the plaintiff. The complaint alleges a substantial compliance with the contract, which is all the law requires.

2. That the contract is void as against public policy. This ▮ contention was made in *Arnold* v. *Custer County,* 83 Mont. 130, 269 Pac. 396, concerning a similar contract in so far as this feature of the case is concerned, but, without discussing the question, the contract there considered was held to be legal.

In *Von Rosenberg* v. *Lovett,* (Tex. Civ. App.) 173 S. W. 508, 511, cited with approval in the *Arnold Case,* it is said of a similar contract: "The purpose of the contract * * * is commendable, to say the least. Its clearly expressed purpose is to aid the county in its search for property which has been omitted from taxation, and to assist in collecting the amount found due on account thereof. * * * Public policy demands that every taxpayer contribute his just proportion to the expenses of government."

Section 7553, Revised Codes of 1921, declares that which cannot be legally done, and thereunder this court has held that "a contract will not be held void as against public policy unless it in itself requires the doing of something which adversely affects the public welfare, or is forbidden by law, or the consideration of which is illegal or immoral." (*Dallas* v. *Douglas,* 45 Mont. 114, 122 Pac. 275, 278.)

Simpson's proposal to the county commissioners contains the preamble: "It appearing that a large amount of taxable property has escaped assessment and it also appearing that county warrants are being registered and discounted, that the revenues of the county are insufficient to meet its expenses, and owing to the cessation of mining operations in said county, the revenue derived from the net proceeds of the mines for

this year will be greatly diminished, I propose to secure and furnish to your board information which will enable you to cause such property to be assessed and taxed according to law.''

This being the situation shown by the record, the remarks of the supreme court of Kansas, in *State ex rel. Coleman* v. *Fry,* 77 Kan. 540, 16 L. R. A. (n. s.) 476, 95 Pac. 392, 394, are peculiarly applicable, i. e.: "The situation has been such that it is not a wonder that boards of county commissioners should embrace almost any plan that promised a reasonably fair collection of necessary public revenues in proportion to the amount of property really owned by the citizens of their respective counties.''

A contract, the purpose of which is to aid the board of county commissioners to perform duties laid upon it by law, is not ''forbidden by law'' in this state (*State ex rel. Blair* v. *Kuhr,* 86 Mont. 377, 283 Pac. 758, 760), and such a contract as this affects the public welfare beneficially and not ''adversely.'' So far as its purpose is concerned, the contract is not void as against public policy.

It is, however, contended that the provision in the contract for the payment of an aliquot part of the taxes collected renders the consideration illegal or immoral, and therefore condemns the contract as void. ·

Such contracts have been condemned as against ''sound public policy'' (*State ex rel. Coleman* v. *Fry,* above; *Murphy* v. *Swanson,* 50 N. D. 788, 32 A. L. R. 82, 198 N. W. 116; *Platte County* v. *Gerrard,* 12 Neb. 244, 11 N. W. 298), but in each of these cases it was first held that the county commissioners had, under the statutes of the states mentioned, no power to make the contract under consideration, and the contract condemned was void, regardless of the provision as to remuneration. The condemnation of the retainer fee feature of the contracts considered in those cases is based largely upon a castigation of the ancient system of ''tax farming'' and the employment of ''tax ferrets''; thus it is said in the *Fry Case:* ''The tax ferret, coming upon the scene with a

contract for fat commissions, acquaints himself with the evasions that have occurred in past years, and by threats of public exposure and even criminal prosecution, in short by all the methods known to the blackmailer, forces from the citizen a statement of property to be taxed and even a payment of money for past delinquencies far beyond the requirements of the law.''

A ''tax ferret'' is defined as a person engaged in the business of searching for property omitted from taxation. (*Stevens* v. *Henry County*, 218 Ill. 468, 4 Ann. Cas. 136, 4 L. R. A. (n. s.) 339, 75 N. E. 1024.) Such a person may be employed for the purpose designated, provided the power is vested in the employer to make the contract. (See note to the last cited case, in 4 Ann. Cas. 136, and 4 L. R. A. (n. s.) 339.)

Here, the atrocities suggested in the above quotation from the *Fry Case* could not be perpetrated under the contract before us, as the employment is not to assist the assessor in making yearly assessment or to compel citizens to make returns to him, but only to furnish to the board of equalization information on which it, sitting as an impartial trier of facts, may determine whether or not property justly subject to taxation has been omitted from the assessment-rolls, and, if it finds that such is the case, take the proper steps to have the property duly and equitably assessed. We see nothing in this situation to warrant the adoption of the rule announced in the cited cases; nor do we see any reason why, on entering into such a contract, the board, if it has power to contract at all, may not properly agree upon a reasonable contingent fee in case taxes are brought into the treasury, and thus save the amount of the salary of a person employed for this purpose in case little or no omitted property is found. Contracts for contingent fees, in litigated cases and the like, are generally upheld, unless they appear clearly extortionate (*Taylor* v. *Bemiss*, 110 U. S. 42, 28 L. Ed. 64, 3 Sup. Ct. Rep. 441), and we see no good reason for condemning a like agreement with a layman for the performance of services the result of which is doubtful or problematical. There is no intimation in the

record that the percentage agreed upon is extortionate or in excess of the value of the services rendered. The contract is not void as against public policy.

3. Whether or not a board of county commissioners may, in ██ ██ any case, contract to pay out county money for information or services in aid of the performance of official duty, depends largely upon the law of the forum; many authorities are cited by counsel for the defendant which condemn such contracts as the one before us, but in the majority of those cases the contract considered contravened express statutory provisions, while in others the courts found that such power was neither expressly nor impliedly conferred on the county board.

In this state the question has already been determined in favor of such power, under certain conditions (*Arnold* v. *Custer County* and *State ex rel. Blair* v. *Kuhr*, above), and, under statutory provisions similar to our own, such contracts have been upheld and enforced in other jurisdictions (*Von Rosenberg* v. *Lovett*, above; *Burnett* v. *Markley*, 23 Or. 436, 31 Pac. 1050; *Pacific Timber Co.* v. *Clark*, (D. C.) 233 Fed. 540; *Fleener* v. *Litsey*, 30 Ind. App. 399, 66 N. E. 82). Counsel for defendant call attention to the fact that certain of these cases are criticised, and the court refused to follow them, in *Fancher* v. *Board of County Commrs.*, 28 N. M. 179, 210 Pac. 237, wherein a large number of cases, both for and against the power, are digested. But neither in the *Fancher Case* nor in any case approved therein does the court go further than to declare that, if power exists in the county board, it must be found in the statutes governing its action, and that "the board cannot be permitted to enter into such a contract as would deprive the assessor of the duty independently imposed upon him, or to relieve him of his official obligation." (*State ex rel. Blair* v. *Kuhr*, above.)

It seems clear from the authorities, including our own decisions, that it is beyond the power of the county board to enter into a contract for services, the performance of which is cast upon a different official or board, and which has the effect of relieving the other of a duty imposed by law, or of usurping

the functions of such other official or board. On the other hand, it seems equally clear that, in this state at least, a board of county commissioners has power to contract with an outsider for information in aid of the board itself in performing a duty imposed upon it, so long as the contract is not in violation of the rule last announced, even though, incidentally, the information received, may aid other officials in the performance of their duties, provided always the grant of power, in the particular instance, is to be found in the statutes. (*Arnold* v. *Custer County* and *State ex rel. Blair* v. *Kuhr,* above.)

4. This brings us to the chief contention made, i e., that the board of county commissioners is not charged with the duty of searching out omitted taxable property in the form of net proceeds of mines, but that duty is laid upon the state board of equalization, and therefore the contract before us violated the rules heretofore announced.

Conceding that the county board would have no authority to make such a contract as that before us under the law as it exists to-day, it does not follow that the board did not have that authority when the contract was made, in 1921, as it must be construed in the light of the law as it existed at the time the contract was made.

It is fundamental that a board of county commissioners may exercise only such powers as are expressly conferred upon it by law or necessarily implied from those expressly granted; but it is equally true that, when powers are granted to the board, and no mode of exercise is indicated, the board may in its discretion select any appropriate mode or course of procedure. (*State ex rel. Blair* v. *Kuhr,* above; *Fisher* v. *Stillwater County,* 81 Mont. 31, 261 Pac. 607; *Stange* v. *Esval,* 67 Mont. 301, 215 Pac. 807.) If, then, the duty to search out omitted property and cause its assessment is laid upon the board of county commissioners, and, at the time of the contract, that duty rested upon no other official or board, the contract was within the power of the board.

It is the business of the county, acting through its officers and agents, to see that all property liable to assessment and taxation is placed upon the assessment-roll, to the end that the burdens of government may fall in like proportion upon all. (*Burnett* v. *Markley,* above.) For this and other purposes the board of county commissioners is made the business manager of the county, and is empowered "to supervise the official conduct of all county officers * * * charged with assessing, collecting, safekeeping, management, or disbursement of the public revenues" and "to perform all other acts and things required by law * * * or which may be necessary to the full discharge of the duties of the chief executive authority of the county government." (Sec. 4465, subds. 1 and 25, Rev. Codes 1921.) It is made the county board of equalization charged with the duty of "examining" the assessment-books (sec. 2113, Id.) and, consequently, of "reviewing" the work of the county assessor. (*State ex rel. Blair* v. *Kuhr,* above.)

The power to "examine" the assessment-books and review the work of the assessor includes, and grants, the power to oversee the assessment of all property which should be upon the assessment-books and to determine whether the rolls include all of the assessable property of the county. (*Von Rosenberg* v. *Lovett,* above.) Incidental to this power of determining, and the purpose thereof, is the searching out of omitted property and compelling its addition to the assessment-books so that all property of the county be assessed. (Sec. 1997, Rev. Codes 1921.)

The duty of assessing all property is laid upon the county assessor (sec. 2002, Id.), which duty includes that of the assessment at any time, of property which he "discovers" to have escaped assessment. (Sec. 2034, Id.) Thus the power of searching out and adding to the assessment-roll omitted property generally lies with the assessor as well as the board of county commissioners.

Even where, as here, the statutes are broad enough to give to the county board power to thus secure the assessment of

omitted property, according to a majority of the decided cases, the authority of the board to contract for such work depends upon the further question as to whether or not the duty is imposed upon other officials. (*Whittinghill* v. *Board of Commrs. of Woodward County,* 68 Okl. 320, [11 A. L. R. 913, 174 Pac. 489].) On whom, then, did the duty rest in mid-1921?

Up to and including 1920, reports of net proceeds of mines were made to the county assessor, who made the assessment (secs. 2563–2566, Rev. Codes 1907), and the duties of the assessor and of the board of county commissioners, with reference to this class of taxable property, were the same as those with respect to any other class of property (sec. 2567, Id.). If our law had remained in this condition, it is questionable, at least, as to whether the county board would have had power to enter into such a contract as that before us, even though the assessor was furnished with no adequate machinery for the performance of the duties imposed upon him.

However, by an Act approved March 8, 1921 (Laws 1921, Chap. 237), thus antedating the contract in suit, the law was radically changed; the reports of net proceeds were required thereafter to be made to the state board of equalization (sec. 2089, Rev. Codes 1921), and this state board computed the valuation (sec. 2090, Id.), and certified it to the county clerk for entry on the assessment-rolls of the county (sec. 2091, Id.), thus eliminating the assessor from participation in the assessment of this class of taxable property. By this Act the power to examine the books of mining companies to determine the correctness of current reports and to assess this class of property as though no report had been made, if the report is found to be fraudulent, was taken from the assessor and reposed in the state board (secs. 2093, 2094, Id.), but nowhere in the Act is the power to assess this class of property, which had theretofore been omitted, mentioned, and the power of the assessor to search out omitted property is confined to property which he is authorized to assess.

The state board consisted of the governor, secretary of state, state treasurer, state auditor, and attorney general (Const., Art. XII, sec. 15), and, prior to the Act of 1921, was declared to be "a special tribunal * * * with limited powers and charged with specific duties," its powers being defined by the Constitution in general terms and enumerated with somewhat greater particularity by the statutes. (*State* v. *State Board of Equalization*, 56 Mont. 413, 185 Pac. 708.) The Act of 1921 gave this board added powers and imposed upon it additional duties, but its powers, under the Act, cannot be held to go beyond those enumerated or necessary to carry the granted powers into effect.

In 1922 the state officials were relieved from the duty of acting as a state board of equalization, and a special tribunal, the members of which are appointed by the governor, was provided for by a constitutional amendment (Appendix, Laws of 1923, p. 613), and thereafter the legislature proceeded to define and declare the powers and duties of this tribunal (Chap. 3, Laws of 1923). By this constitutional amendment the people intended to confer "amplified powers" upon the state board, and the powers theretofore granted were "amplified" by the Act of 1923, in which, for the first time, this board was granted power to search out and cause to be assessed net proceeds of mines which it found had been omitted in past years.

The proceedings instituted by the county board, in virtue of the information received from this plaintiff, resulted in actions in which the above declarations were made, and show the action of the county board, the state board, and in the courts, as alleged in plaintiff's complaint, which forced the assessment, finally, of "net proceeds" amounting to $1,186,245.80, in Silver Bow county, omitted in 1920 and assessable in 1921. (*Butte & Superior Min. Co.* v. *McIntyre*, 71 Mont. 254, 229 Pac. 730; *State ex rel. Bourquin* v. *State Board*, 67 Mont. 340, 215 Pac. 667.)

That the power to search out "net proceeds" omitted in 1920 did not exist, prior to the Act of 1923, in the state board, is evidenced by the fact that the legislature found it necessary or expedient to clothe that board with the power by that Act. (*McKenzie* v. *Doran*, 39 Mont. 593, 104 Pac. 677.)

From the foregoing analysis of the law, it will be seen that, in the year 1921, neither the county assessor nor the state board of equalization had authority to search out and cause to be assessed property of the class here considered, but that power resided in the board of county commissioners; the county board was therefore the sole depository of this power, and any steps it took to discover such property were in aid only of the performance of a duty imposed upon it, and did not relieve any other official of a duty or invade the province of any board or official.

5. Finally, it is asserted that the disclosure of net proceeds was not within the contemplation of the contracting parties or the terms of the contract.

While, as it has been shown, the property was not such that the board could, on learning thereof, direct or compel the county assessor to place it on the assessment-roll for the year 1921, it was property which the assessor could, and should, have assessed in 1920; it was omitted in that year, and subject to assessment in 1921; it was property which the board of county commissioners, and that board alone, had the right, and was charged with the duty, to search out and discover in 1921. By reason of the information received from plaintiff, the board took the necessary steps to have the property placed on the assessment-rolls, and it does not appear from the record that the deduction made by the mining company in 1920 appeared as illegal on the report made, or that the county board questioned the information as not being within the terms of the contract; on the contrary, according to the admitted allegations of the complaint, they took such steps as that, ultimately, the county collected a large amount of taxes by reason of the information furnished.

In the situation as it existed in 1921 it was only by reason of such action as was taken by the county board that this desirable result could be reached. The informer was the first actor, the county board the second. Prior to that time the next actor would be the county assessor under the order or direction of the county board.

At that time it was necessary to invoke action by the state board also, and, had the state board refused to act, the county board could have compelled action by writ of mandate; as the state board acted, all that was left to do, after the litigation was over, was for the county clerk to enter the assessment on the identical book in which the entry would have formerly been made by the county assessor.

So long as the county board was in duty bound to act in the matter, and the final result was a county assessment, it was immaterial that, as an intermediate step, action by the state board was required; indeed, a reasonable construction of the contract does not require that plaintiff do more than to disclose to the county board information on which it was required to act, which action would result in the collection of taxes on a county assessment made as of the year 1921,— that is, on property properly assessable in 1921. The plaintiff has performed his contract fully, and the conditions on which he is entitled to remuneration have been met; he is entitled to recover.

The judgment is affirmed.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES GALEN, FORD and ANGSTMAN concur.